[No. A068933. First Dist., Div. Four. July 15, 1996.]

ROBERT BARKALOFF, Plaintiff and Respondent, v.
VIRGINIA WOODWARD, Defendant and Appellant.

**COUNSEL**

Bernard N. Wolf and Susan A. Bender for Defendant and Appellant.

Lauren S. Taylor and Joan Zorza as Amici Curiae on behalf of Defendant and Appellant.

Robert A. Roth for Plaintiff and Respondent.

## OPINION

**REARDON, J.**—This appeal is from an order granting visitation rights to an unmarried man in an action brought by the mother under the Domestic Violence Protection Act (DVPA) (see Fam. Code, § 6200 et seq.),[1] where both the mother and the biological father, who are in a "marital relationship," object to the visitation. We conclude that the DVPA provides no basis for such an order and reverse.

## I. BACKGROUND

### A. *Factual Summary*

Appellant Virginia Woodward and respondent Robert Barkaloff met in January 1986 while classmates at University of California, Berkeley. Woodward was pregnant at the time. They began dating that spring. Woodward told Barkaloff she did not know who the father was. They started living together shortly before Woodward gave birth. Barkaloff trained as a labor coach and was present when Cassandra (Cassie) was born.

The couple lived together off and on for approximately five years. Malin, their child, was born 15 months after Cassie. The couple held Barkaloff out to the world as Cassie's father as well as Malin's father. He participated in child rearing and assumed parental responsibilities.

Woodward and Barkaloff had a stormy relationship. They argued and yelled; occasionally there were incidents of physical violence. At trial the parties posed differing points of view as to who initiated the violence. Barkaloff stated he could not recall if he ever started a fight with Woodward or hit her first. Woodward, her mother and father testified to Barkaloff's initiation of violent and abusive behavior toward Woodward. Both Woodward and Barkaloff admitted that the children witnessed many of their disputes. Both testified to inappropriate and injurious parenting on the part of the other, and Woodward and her parents spoke of incidents when Barkaloff exposed the children to inappropriate sexual activity or engaged with them in sexually inappropriate ways.

Meanwhile, Jesus Garcia, a longtime friend of the Woodward family and past boyfriend of Woodward, also spent time with the couple and the girls. Woodward and Barkaloff separated permanently in the latter part of 1991. Since the separation Barkaloff rented rooms in other homes, shared an apartment and then ended up in a communal household with two male

---

[1] All further section references are to the Family Code.

friends and his girlfriend, Ann Cheatham. In August 1992 Woodward began living with Sheila Sernovitz, with whom she had an intimate relationship. It was during her relationship with Sernovitz that Woodward began to identify herself as a battered woman.

In May 1994 Garcia and Woodward pursued blood tests to confirm Garcia's paternity; confirmation was forthcoming in June. Garcia and Woodward married on June 18 and shortly thereafter revealed to Cassie that Garcia was her real dad. The next month Garcia filed a paternity action. He asked that Barkaloff not be allowed visitation with Cassie. A stipulated judgment of paternity was entered in his case. The newly married couple lived with Sernovitz for approximately two months and then moved with the children to Montara where they now live in the home of Woodward's parents. Barkaloff subsequently moved to Fremont into a two-bedroom home with Cheatham.

### B.  *Procedural Summary*

On January 27, 1993, Woodward filed an order to show cause under the DVPA seeking restraining orders against Barkaloff in regard to herself, her two daughters and Sernovitz. Therein she also sought child support from Barkaloff, and asked that visitation be suspended pending evaluation by family court services (FCS).

Then on February 5, 1993, Barkaloff instituted proceedings under the Uniform Parentage Act (UPA) (see § 7600 et seq.) to establish a parent and child relationship between him and each of the girls. He sought joint custody and child support.

On February 24 both parties appeared in the DVPA action and stipulated to mutual restraining orders, that Woodward have temporary custody of Cassie and Malin, with unsupervised visitation rights to Barkaloff. The court also ordered Barkaloff not to sleep in the same bed with the children and consolidated the matter with the UPA action.

Thereafter Woodward filed her response to Barkaloff's UPA suit in which she requested a blood test "to refute Plaintiff's allegation" that he was Cassie's father.

On the hearing on the consolidated cases two months later, the court continued the existing orders and referred the parties and the children to FCS for evaluation. Subsequently, Woodward filed a supplemental declaration requesting supervised visits for Malin and suspension of all visitation with Cassie. She stated that Barkaloff was not Cassie's biological father.

At the second hearing on the consolidated cases, the court ordered that: (1) Barkaloff be "included in Malin's assessment" regarding possible sexual abuse and need for therapy as conducted by Dr. Hilde Clark; (2) the current custody and visitation schedule remain in effect; and (3) Barkaloff pay child support for Malin.

### FCS Evaluation

The custody evaluation by FCS recommended that: (1) the parties have joint legal custody of both children, with primary physical custody to Woodward and visitation rights to Barkaloff; (2) the children continue in therapy, both parents pursue individual therapy and a psychiatrist evaluate Barkaloff for possible use of antidepressant medication; and (3) Barkaloff attend parenting classes, participate in a men against violence group and ensure sleeping arrangements so that the girls do not sleep in his room or his bed with him.[2]

### Hearing on Court's Jurisdiction; Reconsideration; Gayden Hearing

Meanwhile, Woodward raised the issue of the court's jurisdiction to grant Barkaloff visitation with Cassie. Following a hearing, the court ruled that while it would be in Cassie's best interests to have visitation with Barkaloff, given that Barkaloff was not Cassie's biological father there was no basis for so ordering under the UPA; further, the DVPA did not provide a vehicle for such an order, and Woodward's objection appeared to bar visitation under *In re Marriage of Gayden* (1991) 229 Cal.App.3d 1510 [280 Cal.Rptr. 862]. Barkaloff sought reconsideration. The court granted the motion and vacated the prior judgment, this time finding that the DVPA did provide a vehicle for a visitation order and thus its previous decision was incorrect.

The matter was then set for a hearing to determine whether visitation was proper in light of the *Gayden* standard. At the conclusion of the hearing, the court found that it would be detrimental to Cassie to discontinue visitation by Barkaloff. The court entered judgment calling for visitation with Cassie twice a month, with provision for holiday and summer vacation visits. With respect to jurisdiction, the court relied on sections 3021, subdivision (e) and 3100 as authority for entering a visitation order under the DVPA.

## II. Discussion

█ Division 8, part 2 of the Family Code governs the right to custody of a minor child. Part 2 applies not only to dissolution, nullity and legal

---

[2]Apparently, Cassie and Malin slept in Barkaloff's room and Malin may have slept in bed with Barkaloff and Cheatham at times.

separation proceedings and actions for exclusive custody, but also to proceedings to determine custody or visitation in actions brought under the DVPA and UPA. (§ 3021, added by Stats. 1993, ch. 219, § 116.11.) The Law Revision Commission comments to this section are particularly pertinent: "This section expands the application of this part to proceedings in which custody or visitation is determined in an action pursuant to the [DVPA] or the [UPA]. Application of this part to these acts provides a complete set of rules where custody or visitation is determined in proceedings pursuant to these acts . . . ." (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) § 3021, p. 166.)

Visitation is a limited form of custody that operates during the time the visitation rights are being exercised. (*In re Marriage of Gayden, supra,* 229 Cal.App.3d at p. 1517.) Reasonable visitation rights may, in the court's discretion, even be granted to nonparents. (§ 3100, subd. (a) [permitting such a grant "to any other person having an interest in the welfare of the child"].)

Turning to the DVPA, section 6323, subdivision (a)(2) provides that the court may issue an ex parte order determining visitation rights "in a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, in an action under the [UPA] . . . *or in a proceeding commenced under this division in the case of a marital relationship between the parties.*" (Italics added.) The court may also issue any of the above orders "after notice and a hearing." (§ 6340, subd. (a).)

As is evident, the authority of the court to render visitation orders under the DVPA is limited. By expressly authorizing ex parte visitation orders in a proceeding commenced under the DVPA only in cases where there is a marital relationship between the parties, the Legislature has implicitly prohibited visitation orders in those proceedings where the parties are not married. (See *Polin* v. *Cosio* (1993) 16 Cal.App.4th 1451, 1454-1457 [20 Cal.Rptr.2d 714].) The court's power under the DVPA to also enter visitation orders after notice and a hearing tracks its power to enter ex parte orders. Nothing in section 6340 concerning orders after noticed hearing expands the court's authority to order visitation in a DVPA action involving an unmarried couple.

The trial court was of the opinion that section 3021, subdivision (e), making the general custody and visitation provisions applicable to proceedings to determine custody or visitation in matters brought under the DVPA, enabled it to rely on section 3100 for authority to award visitation rights to Barkaloff. Woodward contends, and we agree, that section 3021 does not broaden the court's power in a DVPA action beyond the terms of sections

6323 and 6340. By its plain terms, subdivision (e) of section 3021 makes section 3100 applicable to DVPA proceedings only when that proceeding is "to determine custody or visitation . . . ." (§ 3021, subd. (e).) The only proceedings to determine custody or visitation under the DVPA are those allowed by sections 6323 and 6340, and we have already decided that those proceedings are limited to situations where the parties are married.

■   Barkaloff argues, in the alternative, that the visitation order may be sustained under the UPA. This contention was twice rejected by the trial court as a basis for the visitation order, and we reject the contention as well.

Under the UPA, the "parent and child relationship" is defined as "the legal relationship existing between a child and the child's *natural* or adoptive parents . . . . The term includes the mother and child relationship and the father and child relationship." (§ 7601, italics added.) The "parent and child relationship may be established as follows: [¶] . . . [¶] (b) Between a child and the *natural* father, it may be established under this part." (§ 7610, subd. (b), italics added.) This "part" includes section 7611, which specifically provides that "[a] man is presumed to be the *natural* father of a child" if, among other things, "[h]e receives the child into his home and openly holds out the child as his natural child." (§ 7611, subd. (d), italics added.) The presumption of "natural father" is a rebuttable presumption and "is rebutted by a judgment establishing paternity of the child by another man." (§ 7612, subd. (c).)

Here, the trial court had subject matter jurisdiction of Barkaloff's UPA action because he claimed to be a presumed natural father under section 7611, subdivision (d). However, the section 7611, subdivision (d) presumption was conclusively rebutted under section 7612 by a stipulated "judgment of paternity of the child (Cassie) by another man (Garcia)." Once the presumption of "natural father" was rebutted, Barkaloff was not a "natural father" under the UPA. Because Barkaloff was not a "natural father" as defined in the UPA, the trial court, as it correctly found, lacked authority to award him visitation under the UPA, particularly where, as here, the "natural father" and the "natural mother," as defined in the act (§ 7610), objected to such an order (see *Nancy S.* v. *Michele G.* (1991) 228 Cal.App.3d 831, 835, fn. 2 [279 Cal.Rptr. 212]).

In light of our conclusion that the trial court lacked authority under the DVPA and the UPA to order visitation in favor of Barkaloff, the question of whether the trial court abused its discretion is moot because it had no discretion to exercise.

## III.    CONCLUSION

Judgment reversed.

Poché, Acting P. J., and Hanlon, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 16, 1996.