110 Cal.Rptr.2d 126 (2001)
91 Cal.App.4th 86
In re NICHOLAS H., a Person Coming Under the Juvenile Court Law.
Alameda County Social Services Agency, Plaintiff and Respondent,
v.
Kimberly H., Defendant and Appellant;
Thomas G., Defendant and Respondent.
Nos. A092188, A093477.
Court of Appeal, First District, Division Two.
July 31, 2001.
Review Granted November 14, 2001.
*127 Janet H. Saalfield, Sausalito, By appointment of the Court of Appeal under the First District Appellate Project's independent case system, Attorney for Defendant and Appellant Kimberly H.
Frank H. Free, By appointment of the Court of Appeal under the First District Appellate Project's independent case system, Attorney for Defendant and Respondent Thomas G.
Richard E. Winnie, County Counsel, Attorney for Plaintiff and Respondent Alameda County Social Services Agency.
Certified for Partial Publication.[*]
HAERLE, J.

I. INTRODUCTION
This case involves two appeals filed by Kimberly H. in an ongoing juvenile dependency proceeding pertaining to Kimberly's son, Nicholas H., who was born on August 10, 1995. We ordered the appeals consolidated because the primary issue in both cases is whether the juvenile court erroneously concluded that Kimberly's former boyfriend, Thomas G., is Nicholas's presumed father and is entitled to have Nicholas *128 placed in his home during the pendency of these proceedings.[1]
Kimberly has consistently maintained that Thomas is not Nicholas's biological father and that he has no parental rights in these proceedings. Thomas contends that the father-son relationship he has developed with Nicholas qualifies him as a presumed father even though he admits he is not Nicholas's biological father. The Alameda County Social Services Agency (the Agency) refused to take a position with respect to this issue until we ordered it to do so. The Agency now argues that the juvenile court's finding that Thomas is Nicholas's presumed father was rebutted by evidence that Thomas is not Nicholas's biological father.

II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

A. The Dependency Petition

On February 7, 2000, the Agency filed a juvenile dependency petition alleging that Nicholas was taken into custody pursuant to section 300, subdivision (b), of the Welfare and Institutions Code because his parents failed to adequately supervise and protect him. In addition, the petition contained allegations that Nicholas stated that he did not want to live with Kimberly because she was physically abusive toward him. Thomas was identified as Nicholas's alleged father. The following events constituted the factual basis for the petition.
On January 7, 2000, Thomas obtained temporary custody of Nicholas after filing a petition to establish a parental relationship with Nicholas in Alameda County superior court. In his January 5 petition, Thomas alleged the following facts: Thomas lived with Kimberly from May 1995 until December 1997 and from January 1999 until September 1999. Thomas and Kimberly are the parents of Nicholas who was born on August 10, 1995. Kimberly cannot keep a job, is often homeless, and has been in trouble with the law. Since their separation, Kimberly has prevented Thomas from having contact with his son. Most recently, the two fought over Nicholas during a holiday visit in December 1999 at the home of Thomas's mother, Carol, who lives in Lakewood, California. Kimberly attacked and bit Thomas. The police were called and Kimberly was arrested for felony assault. While Kimberly was still in jail, Thomas returned to his home in Alameda County and brought Nicholas with him.
In his petition, Thomas asserted that family and friends of both Thomas and Kimberly supported his request for custody of Nicholas and have acknowledged that Kimberly cannot adequately care or provide for Nicholas. Thomas also submitted letters of support from his friends and family. In one letter, Thomas's sister explained why Thomas should be considered Nicholas's real father even though he is not the boy's biological father.
On February 3, 2000, Kimberly appeared at the Fremont Police Department and reported that Thomas took Nicholas without her permission. Kimberly told police she was in jail in Los Angeles when Thomas took Nicholas from the home of Thomas's mother to live with him in Union City. Kimberly gave police a copy of a Los Angeles County protective order dated September 3, 1998, restraining Thomas from having contact with Kimberly or Nicholas until March 2, 2001. Police further determined that Thomas had an outstanding misdemeanor assault warrant. *129 They also discovered that Thomas had obtained the January 7 temporary custody order.
Kimberly gave police the following information: Thomas was not the biological father of Nicholas. The two met when Kimberly was pregnant and both had wanted Thomas to be Nicholas's father. Thomas was thus named as the father on Nicholas's birth certificate. Kimberly and Thomas never married but they lived together with Nicholas. After a few years, the couple had problems, which led to domestic violence. Thomas was arrested for battering Kimberly and the restraining order was issued. The couple tried living together again despite the restraining order but they could not get along and often fought about how to raise Nicholas. Kimberly told police about the holiday visit at Thomas's mother's home which resulted in her arrest for battery and Thomas's arrest for outstanding warrants. Kimberly reported that, after Thomas was released, he took Nicholas to Union City without Kimberly's knowledge or permission.
Police went with Kimberly to Thomas's work. Thomas told the officer his version of the holiday visit and that he had obtained temporary custody of Nicholas. He complained that Kimberly was an unfit mother, that she took drugs and that she was homeless. Thomas told the police that the outstanding warrant against him was for failing to complete an anger management class after he was arrested for battering Kimberly in 1998. Police arrested Thomas on the outstanding warrant. Thomas refused to give permission to release Nicholas to Kimberly. The police therefore placed Nicholas in the custody of the Agency.

B. Detention Proceedings

A February 8, 2000, Detention Hearing Report described Nicholas as a very bright and articulate four and one-half year old who appears physically healthy and developmentally on target. Nicholas had reported that his mother went to jail because she bit his father and that his parents often fought over him. Nicholas stated that he did not want to see his mother because she was mean to him and hit him. He also reported that his father smokes cigarettes, but his mother smokes "weed." Kimberly had told the Agency that Thomas was not Nicholas's biological father. Thomas responded that, although Kimberly periodically claimed he was not Nicholas's father, she also filed for child support. The Agency identified the home of removal as the "home of the parents" and recommended that it retain custody of Nicholas and place him in a suitable family home or private institution pending further proceedings.
A detention hearing was held on February 8, 2000. A transcript of that proceeding is not included in the appellate record. However, the juvenile court's order indicates that the matter was continued for a contested hearing, and that the Agency was granted discretion to release Nicholas to Thomas.
According to a February 17 Court Report Addendum, the Agency placed Nicholas in Thomas's care on February 15 following a satisfactory home evaluation. Thomas was living in a house with roommates, was working as a wholesale distributor and had enrolled Nicholas in daycare. Thomas was encouraged to complete his anger management classes as required by the Los Angeles County court order. The Agency reported that Kimberly planned to return to Southern California and work as a nanny. Kimberly told the Agency that she appeared to be a transient because she had to move often to get work as a nanny and to elude Thomas, whom she described as a stalker. Kimberly was expecting a *130 baby in early April 2000 and was currently residing in a Bay Area shelter.[2] As to the recent domestic violence incident with Thomas, Kimberly claimed she acted in self-defense; she bit Thomas because he was trying to choke her while she was holding Nicholas in her arms.
Kimberly had a supervised visit with Nicholas on February 13. Nicholas did not exhibit any fear of his mother. However, after the visit, he repeated that his mother had hit him in the past with a belt and that she was mean. Nicholas continued to express his desire to live with Thomas. The Agency recommended that Nicholas be "detained in the home of his father, pending Jurisdictional Hearing."
The detention hearing continued on February 17. Again, we have no transcript of the proceeding. According to a February 17 minute order, the juvenile court found that the welfare of the minor required that he be removed from his mother's home. The Agency was granted continuing discretion to place Nicholas with Thomas pending further proceedings. The court further ordered that Nicholas was to have supervised visits with Kimberly.

C. Jurisdictional Proceedings

In its February 24, 2000, Jurisdictional/Dispositional Hearing Report, the Agency opined that Nicholas could not be safely placed in the home of his mother or his alleged father. Kimberly was transient and had no concrete plan for the near future. Nicholas had alleged that his mother physically abused him and expressed the wish that he not be alone with her. In addition, Kimberly had engaged in domestic violence while Nicholas was present. Thomas also had a history of domestic violence against Kimberly committed while Nicholas was present. Furthermore, Thomas was considered by the Agency to be "a non-related caretaker," who could not pass the required certification/licensing requirements because of his conviction for domestic violence.[3] Nicholas was aware of his parents' fighting and their acts of physical violence against each other and would likely require therapy to address this issue.
The Agency had determined that this family had four referrals to Child Services in Los Angeles during the period between February 1997 and August 1999, but it had no information about the nature of these referrals. In addition, Kimberly had a battery conviction for the December 1999 altercation with Thomas. Thomas had a 1999 conviction for possession of marijuana and a 1997 conviction for battering Kimberly. He had also been arrested on February 3, 2000, for driving without a valid license (Veh.Code, § 12500, subd. (a)). The child abduction charges Kimberly made against Thomas that same day, however, were determined to be unfounded.
The Agency recommended that Kimberly be allowed supervised visitation and that Thomas should have unsupervised visits with Nicholas. According to the Agency, "[t]he minor seems to have a strong bond with [Thomas] and he knows [Thomas] as his only father." The Agency further recommended that Nicholas be declared a dependent of the juvenile court, that he be removed from the physical custody of both *131 parents, and that both parents receive reunification services.
The jurisdictional hearing commenced on February 24, 2000. Thomas submitted evidence of a Petition for De facto Parent Status, which he had filed in superior court the previous day. In his petition, Thomas maintained that he is the only father Nicholas has ever known and that Nicholas would be devastated if he discovered Thomas was not his father. Thomas further stated that "I consider Nicholas [] to be my son. I love him as much as any father would love a natural son." According to Thomas, he and Kimberly agreed Thomas would be Nicholas's father when Kimberly was still pregnant. Thomas was present when Nicholas was born, cut his umbilical cord, and was the first person to hold him immediately after his birth. Thomas's name was put on Nicholas's birth certificate. During the next few years, Thomas lived with Nicholas and supported him.
Attached to Thomas's petition was an investigation report prepared by a Family Court Services counselor. The counselor had not interviewed Kimberly but reported that information from friends and relatives of the family supported Thomas's allegations of Kimberly's drug use, transiency, lack of gainful employment and violence toward others. The counselor reported that Kimberly's father had witnessed Kimberly's verbal and physical abuse of Thomas, and he described his daughter as "`impulsive and assaultive,'" and said that Thomas was "`honest, consistent and forthright.'" Also attached to Thomas's petition was a copy of a complaint filed in the superior court in Los Angeles on December 7, 1999, seeking a judgment establishing Thomas's obligation to pay child support for Nicholas. According to that complaint, Thomas is named as the father of Nicholas in a declaration of paternity on file with the Los Angeles County district attorney.
A transcript of the February 24 hearing is not included in the appellate record. However, the court commissioner, the Honorable Beverly Daniels Greenberg, issued an order that day finding that Thomas had made a "preliminary prima facie showing" of paternity. The jurisdictional hearing was continued, Nicholas was to remain with Thomas pending further hearing, and the commissioner indicated she would review Thomas's status at the next hearing. In the meantime, the Agency was ordered to "facilitate" visitation between Kimberly and Nicholas.
At the continued dispositional hearing on March 2, 2000, Commissioner Daniels Greenberg asked the parties to address whether Thomas was a presumed father under Family Code section 7611, subdivision (d),[4] which grants presumed father status to a man who both receives a child into his home and openly holds out the child as his natural child. Thomas's counsel argued that Thomas was a presumed father both under the statute and pursuant to a May 28, 1999, Los Angeles County superior court judgment which obligated Thomas to pay child support for Nicholas.[5] The Agency's counsel argued that Thomas's admission that he is not the biological father rebutted the presumption he was Nicholas's father. Agency counsel further argued that the Los Angeles judgment was not controlling because it was a default *132 judgment and there was no finding in that case that Thomas was a presumed father. Finally, counsel expressed concern about the Agency's potential liability since Thomas could not be certified and thus could only gain custody of Nicholas if he was a relative or presumed father. Kimberly's counsel took the position that the mother's right to custody and visitation should have priority and should not be "trumped by a non-biologic, non-relative."
Commissioner Daniels-Greenberg ruled that Thomas was Nicholas's presumed father. Thereafter, Thomas submitted to the jurisdiction of the juvenile court. Initially, Kimberly contested the court's jurisdiction. However, after she changed counsel and the dependency petition was amended, Kimberly submitted to the court's jurisdiction at an April 5, 2000, hearing before the Honorable Julia Spain.[6]
At the April 5 hearing, Kimberly also identified a man named Jason S. as Nicholas's biological father and asked that a DNA test be ordered. Judge Spain ordered that Jason S. be tested. The court further ruled that the Agency had continuing discretion to facilitate visitation between Kimberly and Nicholas. Finally, the court ruled Nicholas's placement with Thomas was proper in light of the commissioner's finding that Thomas was the presumed father.

D. Disposition

The Agency filed a Court Report Addendum on May 2, 2000, in anticipation of the dispositional hearing. The Agency reported that Thomas had moved to a new residence in Hayward and that Kimberly had moved to a different shelter. Kimberly was working for a temporary agency and was visiting Nicholas on a regular basis. She was caring and appropriate during visits although Nicholas continued to state his desire to live with Thomas. The Agency had been unable to obtain enough information from Kimberly to locate Jason S.
The Agency recommended that the court continue placement of Nicholas with Thomas. However, the Agency also urged the court to adopt the proposed findings set forth in its Jurisdictional Court Report. As noted above, in that report the Agency recommended that Nicholas be declared a dependent of the juvenile court and be removed from the custody of both parents.
The dispositional hearing commenced on May 3, 2000, and both Thomas and Kimberly contested the Agency's recommendation. Kimberly's new counsel argued that Thomas's admission that he was not Nicholas's biological father rebutted the presumption that Thomas was Nicholas's natural father and deprived Thomas of standing. Judge Spain rejected this contention, stating "[h]e doesn't have to be a biological father to be a presumed father." Kimberly's counsel also complained that Thomas was interfering with Kimberly's right to visitation with her son. The court requested that the Agency worker attend the next hearing to address the issue of visitation. The matter was then continued for a contested hearing.
The Agency filed a Dispositional Hearing Report on May 10, 2000. According to the report, Thomas failed to bring Nicholas to a scheduled visit with Kimberly on May 9. Instead, he left a telephone message that he and Nicholas were in Los Angeles and intended to relocate there in the near future. The Agency worker *133 called Thomas in Los Angeles. Thomas reported that he lost his job because Kimberly had disrupted his life by, among other things, demanding visits with Nicholas. Thomas was "irate" and extremely critical of Kimberly. The Agency worker told Thomas he did not have permission to take Nicholas out of the county. Thomas responded that he had informed both Kimberly and the Agency that he might be moving. Thomas also reported that he had given notice at his apartment. The Agency worker reminded Thomas of the pending court proceedings and urged him to return to the county immediately. Thomas responded that he only had a plane ticket for himself. Again, the Agency worker urged Thomas to return with Nicholas. Later, Thomas's mother, Carol, contacted the Agency to express her view that Nicholas should be taken away from Kimberly. The Agency worker urged Carol to encourage Thomas to return Nicholas to the county.
In its May 10 report, the Agency recommended that Nicholas be declared a dependent of the juvenile court and that he be removed from the custody of both Thomas and Kimberly. The Agency also recommended reunification service plans for both Kimberly and Thomas.
The contested dispositional hearing commenced May 12, 2000. At that hearing, Kimberly's counsel again disputed the finding that Thomas was Nicholas's presumed father. Judge Spain ruled that issue was not before her because the time to contest the commissioner's finding or to request a rehearing had past. The court then heard testimony from Sylvina Cooper, the Agency worker assigned to handle Nicholas's case.
Cooper testified that the Agency originally recommended that Nicholas be placed with Thomas because the two appeared to have a "very good relationship." Thomas was "nurturing," had a good routine for the child, was cooperative and appeared "stable enough to do it." The Agency changed its recommendation after the May 9 incident. Cooper now recommended against placing Nicholas with Thomas because Thomas was hampering reunification efforts with Kimberly and because the Agency had lost trust in him. In addition, Thomas had lost his job, given notice at his apartment and had failed to address his anger problem notwithstanding the Los Angeles county order that he do so. According to Cooper, Thomas was no more stable than Kimberly.
At the May 12 hearing, the Agency requested that Nicholas be immediately removed from Thomas's care and that he be placed in a shelter. Thomas, who had returned from Los Angeles with Nicholas and appeared at the hearing, reported that he was still living in his apartment and that his landlord was willing to ignore his thirty-day notice. Thomas also reported that he would eventually like to relocate to Southern California to be closer to family and find better work. However, Thomas did not intend to move in the near future.
The court characterized Thomas's behavior as "foolish," and as changing the "posture" of this case. However, the court did not share the Agency's concern that Thomas posed a health or safety threat to Nicholas. The court also noted that Thomas had not been expressly told to stay in the county. After further discussion, the court concluded the Agency had "a gross overreaction in this instance," and stated that it was "appalled at the way this has been handled." Over the Agency's objection, the court then conducted an ex parte meeting with Nicholas and his counsel.
After meeting with Nicholas, the court described him as "one of the most delightful children I have had the pleasure to *134 spend time with in quite some time." The court stated that the meeting with Nicholas gave it "greater confidence" to follow through with its intention to leave him in the placement with his father. According to the court, Nicholas had made it clear that he felt safest and happiest with Thomas and that he "readily volunteered he's confident his daddy loves him the most." Thus, after obtaining assurances from Thomas that he would not remove Nicholas from the court's jurisdiction or do anything to frustrate Kimberly's visitation rights, the court ruled that Nicholas could stay with Thomas. The court also rejected Kimberly's request for increased visitation because Nicholas had told the court that his mother made him mad and sad and that visiting with her made him sad. The disposition hearing was continued to July 11.
On July 7, 2000, the Agency filed another Disposition Report. The recommendation in this report was that "dependency be continued with the minor placed in the home of his father." The Agency reported that Thomas had resumed living at his Hayward residence, had changed employment and "for the most part has been cooperative in complying with" Kimberly's weekly visitation schedule. Thomas continued to express his desire to relocate to Southern California where he would have family support and stability. Thomas maintained that Kimberly should move to Southern California if she wanted to see Nicholas. Kimberly was supporting herself and her new baby[7] through AFDC and living with a family in Fremont while awaiting housing of her own.
The Agency reported that Nicholas had been seen by a therapist. At the boy's insistence, Thomas was present during the session. The therapist reported that Thomas acted appropriately during the session. The therapist told the Agency worker that Nicholas "appeared to be hypervigilent and easily agitated by noises." He was easily distracted, defiant and could be quite difficult to handle. The therapist was unable to formulate an opinion about Nicholas's behavior at this early stage of treatment but indicated she did not rule out hyperactivity or some type of trauma.
At the July 11, 2000, continued dispositional hearing, Judge Spain reversed her prior ruling and found that Kimberly and any other party could present evidence to rebut the presumption that Thomas is Nicholas's presumed father. The dispositional hearing continued for several days while the court heard testimony from several witnesses on issues pertaining to both disposition of this case and Thomas's status as the presumed father.
Thomas expressly testified that he is not Nicholas's biological father. Thomas testified that Kimberly began living with him when she was pregnant with Nicholas. Kimberly told Thomas that Nicholas's biological father did not want a relationship with her or the baby. Kimberly and Thomas agreed that Thomas would be the father and his name was put on Nicholas's birth certificate. Thomas also participated in the birth of Nicholas and chose his name.
Thomas testified that he is not the biological father of any child and that he cannot have children. Thomas claimed that his love for Nicholas "really has nothing to do with the fact that I can't have my own because that just recently happened." Thomas explained: "I love this child as though he is biologically mine. And I don't seeI was raised by a stepfather, and I'm glad I was because he did very well raising me. And, you know, again, *135 I'm very, very happy to do that for Nick. And I don't see any reason why I shouldn't be allowed to." Thomas also testified that Nicholas believes that Thomas is his biological father and has never know anybody else to be his father.
Kimberly testified that Jason S. is Nicholas's biological father. Kimberly stated that Jason knows his relationship to Nicholas and that the two have visited several times, most recently in October of 1999. Kimberly also testified that Thomas threatened to break up with her unless she put his name on Nicholas's birth certificate.
Closing arguments were heard on July 31, 2000. During his closing argument, Thomas's counsel conceded again that Thomas is not the biological father but insisted that Thomas is Nicholas's presumed father. Nicholas's counsel agreed that the presumption had not been rebutted.[8] Counsel for the Agency and Kimberly's counsel both maintained that the presumption was rebutted by Thomas's own admission that he is not Nicholas's biological father.
The juvenile court made its decision and shared it with the parties late in the day on July 31, after the court reporter had left for the day. According to a July 31 minute order, the court adjudged Nicholas a dependent of the juvenile court, found that the home of removal was the home of the mother, and placed Nicholas in the home of his presumed father, Thomas, under the supervision of the Agency. The court also granted Thomas's motion to be declared Nicholas's de facto father. The Agency was ordered to provide family reunification services to Kimberly and family maintenance services to Thomas. The minute order set forth handwritten findings that supervised visits between Kimberly and Nicholas shall continue and that Thomas's "presumed father status will remain." The order also granted Thomas permission to relocate to Southern California and stated that after that move "visits between minor and mother shall be every other weekend supervised visits for 4 hours until such time court receives psych. eval. report."
On August 2, 2000, Judge Spain read her decision into the record. First, the court stated that Commissioner Daniels-Greenberg granted Thomas presumed father status and that ruling was not subject to challenge. Second, the court found that the presumption had not been rebutted. The court expressly rejected the contention that Thomas's admission rebutted the presumption. According to Judge Spain, "[i]f I were to agree with County Counsel that [Thomas's] admission that he is not Nicholas's biological father rebuts the presumption, then what we would be doing is leaving Nicholas fatherless." The court reasoned that, although Kimberly had identified Jason S. as the biological father, that man had not come forward to assert his rights. Acknowledging that Thomas "may ultimately find that biology will prevail," the court concluded that, "at this time, under the facts that had been presented to this Court, I do not find that the presumption has been rebutted. And [Thomas] will continue to receive the rights and benefits of being Nicholas's presumed father as well as the responsibilities."
With respect to disposition, the court found there was clear and convincing evidence that Nicholas must be removed from Kimberly's physical custody. However, *136 the court rejected the Agency's recommendation that Nicholas be removed from Thomas's care. The court acknowledged that Thomas had problems but concluded that Thomas had been caring toward and responsible for Nicholas. The court was also swayed by Nicholas's clear expression of his love for Thomas and his preference to live with him. Thus the court concluded that Nicholas's care and custody would be committed to the Agency but that his placement should continue in Thomas's home. The court ruled that both Kimberly and Thomas were entitled to services and both were ordered to participate in psychological evaluations. The court also vacated its prior order that Jason S. submit to a paternity test. Finally, the court ruled that Thomas could relocate to Southern California with Nicholas and return to the county for appointments and visits with Kimberly.

E. Six Month Review

The Agency filed a Status Review Report on October 2, 2000. Ruth Levin had replaced Sylvina Cooper as the Agency worker responsible for this case. Nicholas and Thomas had moved to Lakewood, California to live with Thomas's mother. Nicholas was physically healthy and had participated in a psychological evaluation and an attachment study that would be completed in the near future. Kimberly was requesting that Nicholas be returned to her care and Thomas was seeking sole custody.
The Agency reported that Kimberly behaved appropriately during supervised visits and that Nicholas appeared to have a good time with his mother and was reluctant to leave her. Kimberly was residing with a couple in Fremont in a home that was appropriate for visitation and overnight visits. The Agency recommended that, although Kimberly consistently expressed her desire to have Nicholas returned to her, her living and financial situation were not sufficiently stable to grant that request.
The Agency reported that Thomas had not complied with the requirement of his case plan that he submit to random drug tests and there was no indication he had complied with the requirement that he participate in domestic violence classes. The Agency worker reported that Thomas had continued to express his anger toward and criticisms about Kimberly in front of Nicholas. The Agency worker had "experienced the intensity of the father's anger over the phone and in person," and reported that Thomas repeatedly complained about Kimberly and her shortcomings as a mother.
Thomas had also failed to comply with several conditions of the visitation plan. For example, he moved Nicholas to Southern California shortly after the August 2 hearing notwithstanding the juvenile court's order that he remain in the county until completion of the attachment study. Thomas also failed to provide transportation for Nicholas to attend visits every other week with Kimberly. Thomas told the Agency he misunderstand the court's visitation order and also complained that Kimberly did not have to pay for any transportation.
The Agency reported that Kimberly was calling Thomas's home every day so she could talk with Nicholas and that Thomas interpreted these calls as an effort to harass him and to upset Nicholas. The Agency worker and Thomas had a heated discussion about these phone calls during which Thomas again expressed his anger and complained that both the Agency and the court were siding with Kimberly and ignoring Nicholas's needs. Nicholas told the Agency worker that he liked to talk to his mother on the telephone but that it *137 made his father mad. Nicholas also admitted to the Agency worker that he sometimes got into trouble at school but asked the worker not to tell Thomas, who would be mad at him.
The Agency concluded that neither parent had made "substantial progress" on their case plan and that there were still many unanswered questions as to the allegations made by the parents against each other. In addition, the Agency had not yet received the results of the attachment study and neither parent had completed the psychological evaluations ordered by the court. Therefore, the Agency recommended that the parents be ordered to comply with their plans and that the matter be continued for an additional six months.
Judge Spain conducted a review hearing on October 6, 2000. Thomas appeared in pro per. At one point during the hearing, the Agency's counsel asked to address the issue of paternity. The court replied that the issue was previously litigated and was now "up on appeal." The court further stated that "for all purposes in this proceeding, [Thomas] is the presumed father of Nicholas, although we're all aware that he is not the biological father."
The court admonished both Kimberly and Thomas to comply with the court's prior rulings and the requirements of their case plan. The court also observed that "it is my goal, over the period of time that I still have you in this court, to get the message across to you that the two of you are going to have to learn how to communicate so that Nicholas is not the constant ping-pong ball emotionally the two of you use against each other. It was made absolutely clear to me at the last hearing that both of you use Nicholas to hurt each other. It's absolutely clear, and you both need to get over it."
The court also modified its ruling regarding visitation. It ordered that visits were to alternate between Alameda County and Southern California, that Thomas was to pay for transportation for visits in Alameda and that either Kimberly or the Agency were to pay for her visits to Southern California. The court also limited Kimberly's telephone privileges to three calls a week at a specified time. In addition, the court set a contested hearing date in response to Kimberly's request that Nicholas be immediately returned to her custody. The court memorialized these rulings in a October 6 minute order.
Kimberly appealed from the juvenile court's dispositional order on August 11, 2000. She appealed from the October 6 minute order on December 1, 2000. As noted above, this court consolidated the two appeals.

III. DISCUSSION

A. Thomas's Status As A Presumed Father

Kimberly contends that the juvenile court orders must be reversed to the extent they implement the court's allegedly erroneous finding that Thomas is Nicholas's presumed father.

1. The statutory framework

"`The Legislature has recognized that a parent who has a child removed for neglect, abuse or substantial risk thereof, in most cases should be provided with services to assist the parent in overcoming the problems that led to removal.'" (In re Zacharia D. (1993) 6 Cal.4th 435, 446, 24 Cal.Rptr.2d 751, 862 P.2d 751.) "Courts have concluded that the word `parent' in the dependency statutes does not include de facto or stepparents. [Citations.]" (Id. at p. 448, 24 Cal.Rptr.2d 751, 862 P.2d 751.) Furthermore, "only a presumed, not *138 a mere biological, father is a `parent' entitled to received reunification services" and the opportunity to obtain custody of a dependent child. (Id. at p. 451, 24 Cal. Rptr.2d 751, 862 P.2d 751.)
When applying the dependency statutes, we use the definition of "presumed father" set forth in the Uniform Parentage Act (Fam.Code § 7600, et seq.)[9] (In re Zacharia D., supra, 6 Cal.4th at pp. 448-449, 24 Cal.Rptr.2d 751, 862 P.2d 751.) As our Supreme Court has recognized, "the statutory term `presumed father' is somewhat `cumbersome.' [Citation.]" (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 823, fn. 3, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) It can also be misleading. Although the term "presumed" connotes uncertainty, the presumed father enjoys greater substantive rights under the Family Code than a man whose paternity is uncontested but who nevertheless cannot obtain presumed father status. (Ibid.; In Re Zacharia D., supra, 6 Cal.4th at p. 451, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
To become a presumed father, a man must satisfy one of the conditions enumerated in section 7611. The only relevant condition in this case is section 7611, subdivision (d) (section 7611(d)), which provides that "[a] man is presumed to be the natural father of a child if . . . [h]e receives the child into his home and openly holds out the child as his natural child."
Except under circumstances not relevant here, "a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).) The presumption "is rebutted by a judgment establishing paternity of the child by another man." (§ 7612, subd. (c).)

2. Thomas qualified as a presumed father under section 7611(d)

In the present case, Kimberly advances several arguments to support her claim that Thomas is not Nicholas's presumed father. Many of her arguments challenge the initial finding granting Thomas presumed father status. We question whether these arguments are timely since this is an appeal from dispositional and six-month review orders made by Judge Spain and not by Commissioner Daniels-Greenberg. Judge Spain did not find that Thomas established he was entitled to the presumption. Rather, she found that the presumption of paternity established in the prior proceeding before Commissioner Daniels-Greenberg was not rebutted at the contested dispositional hearing. Nevertheless, because authority addressing this statutory presumption is confusing, and in order to make our own holding clear, we will address Kimberly's substantive claim that Thomas did not initially qualify as Nicholas's presumed father under section 7611(d) and then separately consider whether that presumption was rebutted under section 7612.
Kimberly contends the commissioner's finding was erroneous because (1) Thomas was estopped from acquiring presumed father status, (2) the commissioner should not have given collateral estoppel effect to the Los Angeles county support judgment, and (3) the commissioner's finding was not supported by substantial evidence.
Kimberly's estoppel argument is based on an apparent misreading of Thomas's January 5, 2000, petition to establish a *139 parental relationship with Nicholas. Kimberly contends that estoppel applies because Thomas intentionally lied to the court in his January 5 petition, a Judicial Council form that Thomas completed and signed.[10] The petition sets forth the following statement: "The court has jurisdiction over the respondent because the respondent. . . ." This statement is followed by three options, each with a corresponding box to be checked as relevant. Thomas checked the box next to the following option: "had sexual intercourse in this state, which resulted in conception of the children listed in item 2." Kimberly argues that Thomas committed perjury by checking this box and representing to the court that he had sexual intercourse in the state resulting in the conception of Nicholas. But Thomas made no such representation. Kimberly was the "respondent" referred to in the question at issue and thus Thomas's representation was that the court had jurisdiction over Kimberly because she had sexual intercourse in the state resulting in the conception of Nicholas. There is no reason to question the veracity of that representation.
In completing the petition, Thomas did identify himself as Nicholas's father. However, he has consistently used that term to describe his relationship to Nicholas and there is no indication of any attempt to mislead the court about the nature of that relationship. Indeed, the letter from Thomas's sister that was attached to the January 5 petition disclosed that Thomas is not Nicholas's biological father. Thus, we reject Kimberly's contention that Thomas was not entitled to presumed father status because he intentionally lied to the court.
Kimberly's collateral estoppel argument is equally misguided. There is nothing in the appellate record to suggest that the commissioner gave collateral estoppel effect to the Los Angeles county judgment obligating Thomas to pay child support for Nicholas. In fact, the commissioner expressly acknowledged the differences between the section 7611 presumption of paternity and the statutory requirements for entering a child support judgment. Contrary to Kimberly's argument in this court, the commissioner simply viewed the child support judgment as factual evidence which, along with other evidence, supported her conclusion that Thomas qualified as a presumed father under section 7611(d).
We also reject Kimberly's contention that the commissioner's finding is not supported by substantial evidence. The commissioner was presented with substantial evidence that Thomas participated in Nicholas's birth, that his name appeared on Nicholas's birth certificate, that he lived with Nicholas for long periods of time, that he has provided Nicholas significant financial support over the years and that he has consistently referred to and treated Nicholas as his son. In addition, there is undisputed evidence that Nicholas has a strong emotional bond with Thomas and that Thomas is the only father Nicholas has ever know. This evidence more that adequately satisfied the requirements of section 7611(d). (See, e.g., Brian C. v. Ginger K. (2000) 77 Cal.App.4th 1198, 1221, 92 Cal.Rptr.2d 294.)
In this regard, it is important to clarify that Thomas was not required to produce evidence establishing a biological relationship with Nicholas in order to acquire *140 presumed father status. "[A] man [may] achieve presumed father status, with its attendant rights and duties, without being the biological father." (In re Zacharia D., supra, 6 Cal.4th at p. 450, fn. 18, 24 Cal.Rptr.2d 751, 862 P.2d 751 [construing former Civ.Code, § 7004 which was repealed and replaced by Fam.Codes, §§ 7611 and 7612 without substantive change].) "By its very terms, the statute creates the presumption of natural fatherhood, arising out of a man's acceptance of a child into his home and acknowledgment of it as his own. [The man claiming the presumption] ha[s] no burden to present evidence establishing his biological link with the child." (Comino v. Kelley (1994) 25 Cal.App.4th 678, 685, 30 Cal.Rptr.2d 728.)
Thus, we reject Kimberly's claim that Thomas did not initially satisfy the requirements of section 7611(d). However, this conclusion does not end our inquiry. We now turn to Judge Spain's ruling that evidence presented at the dispositional hearing was insufficient to rebut the presumption that Thomas is Nicholas's natural father.

3. The presumption that Thomas is Nicholas's father was rebutted

As noted above, the section 7611 presumption that a man is the "natural father" of a child can be rebutted by "clear and convincing evidence." (§ 7612.) To properly evaluate the juvenile court's ruling that the section 7611 presumption was not rebutted in this case, we focus on the two statutory terms we have just quoted from the relevant statutes.
First, the term "natural father" is not defined in section 7611 or elsewhere in the statute. Thomas contends that "natural" does not mean "biological." But he fails to support this contention with relevant authority and he offers no satisfactory alternative definition. Instead he offers the irrelevant observation that paternity presumptions are intended to eliminate the stigma of illegitimacy. Several factors lead us to conclude that the term "natural father" in section 7611 means "biological father."
Although the Family Code does not expressly define "natural father," relevant statutory provisions indicate to us that the Legislature has used the term "natural" to mean "biological." For example, in section 7611 itself, one of the conditions under which a man can acquire presumed father status is if he and "the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated. . . ." (§7611, subd. (a).) Here, the term "natural" mother certainly means biological mother. Another example is Family Code section 7613, which provides that when a husband gives his consent that his wife be inseminated artificially with semen donated by a man not her husband, the "husband is treated in law as if he were the natural father of a child thereby conceived" (§ 7613, subd. (a)), and the donor "is treated in law as if he were not the natural father of a child thereby conceived." (§ 7613, subd. (b).) The obvious intention of this provision is to clarify that, although the husband is not the natural, i.e., biological, father, he will be treated as such under the law.
Further, courts construing sections 7611 and 7612 have assumed that natural means biological. (See, e.g., In re Zacharia D, supra, 6 Cal.4th at p. 449, fn. 15, 24 Cal. Rptr.2d 751, 862 P.2d 751["[a] biological or natural father is one whose biological paternity has been established. . . ."]; Adoption of Kelsey S., supra, 1 Cal.4th at p. 823, fn. 3, 4 Cal.Rptr.2d 615, 823 P.2d 1216 [defining the statutory term "natural father" *141 to mean a biological father who does not qualify as a presumed father]; see also In re Olivia H. (1987) 196 Cal.App.3d 325, 330, 241 Cal.Rptr. 792 [conclusive evidence that the presumptive natural father of the child in question was not the biological father rebutted the presumption of paternity]; Barkaloff v. Woodward (1996) 47 Cal.App.4th 393, 399, 55 Cal.Rptr.2d 167 [section 7611(d) presumption rebutted by evidence that somebody else was child's natural biological father].) Thomas has failed to identify a single case in which the word "natural" is defined to mean something other than "biological."
Finally, in this context, defining natural to mean biological comports with our common sense interpretation of the word. That such is a standard definition is illustrated by consulting Black's Law Dictionary, which defines the term "natural father" as "[t]he man who impregnated the child's natural mother.Also termed biological father." (Black's Law Dictionary (7th ed.1999) p. 623, col. 1.)
Thus, we conclude that the presumption set forth in section 7611 is a presumption that a man is the natural, biological father of the child in question. Therefore, under section 7612, the presumption is rebutted by "clear and convincing" evidence that the man is not the child's natural, biological father. This "clear and convincing evidence" standard is the second statutory term upon which we must focus. Apparently both the juvenile court and Thomas have overlooked this statutory language.
Clear and convincing evidence is evidence that is "`clear, explicit, and unequivocal,' `so clear as to leave no substantial doubt,' and `sufficiently strong to command the unhesitating assent of every reasonable mind.' [Citation.] Otherwise stated, a preponderance calls for probability, while clear and convincing proof demands a high probability. [Citations.]" (1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 38, p. 187.) And, although the weight of the evidence necessary to satisfy this requirement is more than a preponderance, "the clear and convincing standard falls well short of what is required for a criminal conviction." (Ibid.)
Thus, when read in conjunction with section 7611, section 7612 means that the presumption that a man is a child's natural father is rebutted by evidence establishing a high probability that the man is not the child's natural, biological father. (See, e.g., In re Olivia H., supra, 196 Cal. App.3d at p. 330, 241 Cal.Rptr. 792 ["conclusive evidence" that defendant was not the child's biological father rebutted the presumption that the man was the natural father of the child]; Barkaloff v. Woodward, supra, 47 Cal.App.4th at p. 399, 55 Cal.Rptr.2d 167 [blood test establishing paternity by another man rebutted presumption that respondent was natural father]; compare Comino v. Kelley, supra, 25 Cal.App.4th at p. 685, 30 Cal.Rptr.2d 728 [presumption not rebutted when mother failed to produce evidence to support denial of biological paternity].)
On appeal, Thomas maintains that only a judgment establishing the paternity of the child by another man will rebut the section 7611 presumption. Judge Spain reached the same conclusion at the dispositional hearing. Evidence of such a judgment certainly constitutes clear and convincing evidence. Indeed, section 7612, subdivision (c) expressly provides that such evidence rebuts the presumption. However, under section 7612, subdivision (a), the presumption can also be rebutted by other types of evidence that establish a high probability that the man who has acquired the presumption is not the biological father of the child at issue.
*142 In the present case, the record before us contains no evidence of a judgment establishing the paternity of Nicholas by another man. Furthermore, Kimberly's contention that Thomas is not Nicholas's biological father is not, by itself, clear and convincing evidence. However, Thomas and Kimberly both testified under oath at the dispositional hearing that Thomas is not Nicholas's biological father. This testimony does constitute clear and convincing evidence that Thomas is not Nicholas's natural father. Indeed, since the evidence on this point is undisputed, no other conclusion can be sustained.
Ignoring the plain language of section 7612, subdivision (a), Thomas asks us to affirm the juvenile court's finding by honoring the "public policy of granting presumed father status to a man who has an extant relationship with the child." Initially, we note that Thomas mischaracterizes the relevant issue; the question is not whether Thomas was entitled to presumed father status in the first instance, but rather whether that presumption was rebutted. In any event, we acknowledge and respect the bond that develops when an adult assumes the physical, emotional and financial responsibilities of parenting a child. Indeed, that bond is the very justification for section 7611(d). However, we are not free to ignore the statute, which expressly states that the section 7611(d) presumption is rebutted by clear and convincing evidence that the presumed father is not the child's natural father.
Thomas also contends that this court should employ a balancing test to determine whether and how to apply the presumption rules set forth in sections 7611 and 7612, and that the state's strong interests in preserving the integrity of the family unit, protecting the child from illegitimacy and promoting individual rather than state responsibility for child support all weigh in favor of permitting Thomas to maintain the presumption of paternity in this case. But Thomas cites no authority for applying such a balancing test in this context.
The cases upon which Thomas mistakenly relies pertain to a different, conclusive presumption of paternity that a man may acquire with respect to a child born to the man's wife while he is cohabiting with her.[11] (See Michelle W. v. Ronald W. (1985) 39 Cal.3d 354, 362-363, 216 Cal. Rptr. 748, 703 P.2d 88; Comino v. Kelley, supra, 25 Cal.App.4th at pp. 683-685, 30 Cal.Rptr.2d 728; Brian C. v. Ginger K, supra, 77 Cal.App.4th at p. 1219, 92 Cal. Rptr.2d 294.) In cases involving that conclusive presumption, courts often must apply a balancing test to determine whether applying the presumption would violate the constitutional rights of an alleged biological father who has appeared in the proceeding. (Michelle W., supra, at pp.362-363, 216 Cal.Rptr. 748, 703 P.2d 88; Comino, supra, at pp. 683-685, 30 Cal.Rptr.2d 728; Brian C., supra, at pp. 1216-1219, 92 Cal.Rptr.2d 294.) The line of authority addressing that discreet problem simply is not relevant here where Thomas has acquired presumed father status under a different statutory provision. The question we face is whether the distinct presumption that has arisen in this case has been rebutted under section 7612, a provision which was not applied or even mentioned in the conclusive presumption cases upon which Thomas relies.
Thomas also relies on Steven W., supra, 33 Cal.App.4th 1108, 39 Cal.Rptr.2d 535, a case in which a non-biological father was granted presumed father status. In Steven W., Michael was conceived and born *143 while his mother Julie was living with Steven. At the same time, Julie was married to and having sexual relations with Matthew. Apparently, both Steven and Matthew believed they were in exclusive relationships with Julie. When Julie became pregnant, she told each man he was the father. Only Steven participated in the pregnancy and, after Michael was born, Steven and Julie bought a home and parented Michael together. Julie told Matthew that he was not Michael's father. After a few years, during which Steven assumed all parental responsibilities, Steven discovered that Julie was deceiving him about her relationship with Matthew. Steven moved out of the house and Matthew moved in with Julie. Julie and Steven continued to share custody of Michael and Steven continued to take an active role as Michael's father. (Id. at pp. 1112-1113, 39 Cal.Rptr.2d 535.)
Then Steven filed an action against Julie and Matthew to establish he was Michael's father. (Steven W., supra, 33 Cal.App.4th at p. 1113, 39 Cal.Rptr.2d 535.) Matthew sued Julie for divorce, Steven was joined as an interested party and the proceedings were consolidated. Prior to trial, Matthew and Julie had blood tests that revealed that Matthew was Michael's biological father. (Ibid.) The trial court ruled that both Steven and Matthew qualified as Michael's presumed father but that Steven's presumption was controlling because he had the "`more prolonged, intensive and continuing relationship'" with Michael. (Ibid.)
On appeal, Matthew conceded that Steven was Michael's presumed father but argued that his own presumed father status was controlling because he was married to Julie when Michael was born and he also accepted Michael into his home and held him out as his own. (Steven W., supra, 33 Cal.App.4th at p. 1116, 39 Cal. Rptr.2d 535.) The Steven W. court disagreed and affirmed the lower court's conclusion pursuant to former Civil Code section 7004, subdivision (b) (now Fam.Code, § 7612, subd. (b)), which provided that, when two or more presumptions arose and conflicted with each other, "`the presumption which on the facts is founded on the weightier consideration of policy and logic controls.'" (Steven W., supra, 33 Cal. App.4th at p. 1116, 39 Cal.Rptr.2d 535.) The court found that, despite his biological tie, Matthew had failed to develop any meaningful relationship with Michael. On the other hand, Steven had developed an "enduring father-child relationship" and openly held Michael out as his son. (Id at p. 1117, 39 Cal.Rptr.2d 535.)
According to the Steven W. court, paternity presumptions are driven by the state's interests in preserving the integrity of the family, protecting the welfare of the child and preserving and protecting the developed parent-child relationship and "courts have repeatedly held, in applying paternity presumptions, that the extant father-child relationship is to be preserved at the cost of biological ties." (Steven W., supra, 33 Cal.App.4th at p. 1116, 39 Cal.Rptr.2d 535.) Thus, the court concluded, "[g]iven the strong social policy in favor of preserving the ongoing father and child relationship, the trial court did not err in finding that the conflict between the presumptions weighed in favor of Steven." (Id at p. 1117, 39 Cal.Rptr.2d 535.)
The Steven W. court did not address the issue we face in the present case; it did not consider at all the statutory grounds for rebutting the presumption of natural fatherhood. Although the record does not disclose why the issue was not raised, we note that Matthew conceded that Steven was a presumed father. Apparently Matthew did not contend that that presumption was rebutted by the blood test evidence *144 establishing his paternity. Further, the Steven W. court's discussion and consideration of the state's interests in preserving the established father-child relationship was appropriate and relevant to its review of the lower court finding that one presumption trumped another. Here, by contrast, we are not asked to weigh conflicting presumptions or balance competing interests. Any interest the state may have in preserving the relationship between Thomas and Nicholas simply is not relevant to our determination as to whether the statutory standard for rebutting a presumption has been satisfied.
Though Steven W. is distinguishable, we acknowledge that, in it, Steven was permitted to retain presumed father status after the introduction into the record of clear and convincing evidence that he was not Michael's natural biological father. To the extent Steven W. can be construed to support the contention that such evidence does not rebut the section 7611 presumption pursuant to section 7612, subdivision (a), we must disagree with it. Section 7612, subdivision (a) unambiguously provides that clear and convincing evidence that a man is not a child's biological father rebuts the section 7611 presumption of paternity.
All of Thomas's arguments presume that this court can employ equitable considerations to craft an ad hoc definition of the term "parent." However, as courts have recognized in other cases involving claims by non-biological parents, that task is better left to the Legislature, "given the `complex practical, social and constitutional ramifications' of expanding the class of persons entitled to assert parental rights." (Nancy S. v. Michele G. (1991) 228 Cal. App.3d 831, 840, 279 Cal.Rptr. 212 [woman who raised children together with the biological mother and who was listed as children's father on birth certificates did not qualify as a parent under the Uniform Parentage Act]; see also, In re Marriage of Lewis & Goetz (1988) 203 Cal.App.3d 514, 519-520, 250 Cal.Rptr. 30 [stepfather could not obtain joint custody over objections of the child's natural mother]; see also West v. Superior Court (1997) 59 Cal. App.4th 302, 305-307, 69 Cal.Rptr.2d 160.)
The presumption that Thomas is Nicholas's natural father was rebutted at the contested dispositional hearing and the juvenile court's contrary finding must be reversed. This conclusion does not affect the court's substantive dispositional findings, which Kimberly has not challenged on appeal. However, the effect of our conclusion on other rulings contained in the challenged orders is unclear, and is best left for the juvenile court to determine upon remand.

B. Kimberly's Other Contentions[**]

IV. DISPOSITION
The juvenile court's August 2, 2000, dispositional order and its October 6, 2000, six month review order are reversed to the extent that they implement the court's erroneous finding that the presumption that Thomas is Nicholas's father was not rebutted. This case is remanded to the juvenile court for further proceedings consistent with this opinion. Costs on appeal are awarded to appellant.
KLINE, P.J., and LAMBDEN, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III B.
[1] We have decided not to delay resolution of the issue presented by consolidating a third appeal filed by Kimberly to challenge a more recent juvenile court order in these proceedings. (See In re Nicholas H., (A094095, app. pending.)
[2] Thomas does not claim any parental relationship to this unborn child. Kimberly told Fremont police that she was a surrogate mother for this child.
[3] The Agency reported that Thomas had been awarded temporary custody of Nicholas at a Family Court proceeding on February 16, but that Family Court orders "are held in abeyance" due to the juvenile court proceeding.
[4] All further statutory references are to the Family Code unless otherwise indicated.
[5] The judgment was entered pursuant to former section 11355 of the Welfare and Institutions Code, which provided for entry of support default judgments. (See Welf. & Inst. Code, §§ 11354 to 11356.) Section 11355 was repealed in 1999 and replaced by Family Code section 17430.
[6] Originally, the petition alleged that Nicholas reported that Kimberly was physically abusive towards him. However, the petition was subsequently amended to state that Nicholas did not want to live with Kimberly because she "spanked him with a belt and slapped him in the face."
[7] Kimberly gave birth to a son, Joshua, on May 4, 2000.
[8] Nicholas's counsel also argued that, if the court were to find Thomas was not the presumed father, the court should place Nicholas with Thomas's mother Carol, who had developed a strong and loving relationship with Nicholas.
[9] The Uniform Parentage Act was formerly set forth in Civil Code section 7000 et seq., and was repealed and reenacted as part of the Family Code effective January 1, 1994. (See Steven W. v. Matthew S. (1995) 33 Cal.App.4th 1108, 1113, fn. 2, 39 Cal.Rptr.2d 535 (Steven
[10] Kimberly asserts that "the filing of a Petition to Establish Parental Relationship pursuant to subdivision (b) of section 7630 is an absolute prerequisite to the granting of presumed father status." Kimberly cites no authority to support this contention, nor have we found any. In any event, Thomas did file a section 7630 petition in this case.
[11] That conclusive presumption was formerly set forth in section 621 of the Evidence Code and is currently found in section 7540 which provides: "Except as provided in section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."
[**] See footnote *, ante.