[No. G013290. Fourth Dist., Div. Three. June 3, 1994.]

PAUL HENRY COMINO, Plaintiff and Respondent, v.
STEPHANIE LYNNE KELLEY, Defendant and Appellant;
JEFFREY MOYER, Defendant and Respondent.

COUNSEL

Stephanie Lynne Kelley, in pro. per., for Defendant and Appellant.

Murphy & Gold and Steven Rein as Amici Curiae on behalf of Defendant and Appellant.

Glen H. Schwartz and Larry M. Hoffman for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

**OPINION**

**SONENSHINE, J.**—Stephanie Lynne Kelley appeals from a judgment of paternity in favor of Paul Henry Comino in his action to establish a parental relationship with Joshua Paul. We conclude the court properly (1) refused to

apply the conclusive presumption of Evidence Code former section 621[1] to establish the paternity of Stephanie's husband, and (2) found Paul to be a presumed father under Civil Code former section 7004.[2]

## FACTUAL BACKGROUND[3]

Stephanie met Jeffrey Moyer at a wedding in May 1987. At the time, Stephanie lived in a two-bedroom apartment with a roommate, and Jeffrey, a sergeant in the Marine Corps, lived in barracks on a military base. Stephanie and Jeffrey did not date one another, but in July, when Stephanie's roommate moved out, the two agreed to marry for the sake of mutual convenience or economic advantages. Jeffrey called the marriage a "business relationship" which made it possible for him to receive a married man's "privileges through the military." Stephanie had a "replacement" roommate to share rent payments, and she qualified for medical insurance available to dependents of military personnel.

After their July meeting, Stephanie and Jeffrey did not see each other again until August 12, when they were married at the Orange County courthouse. Following the ceremony, which none of their friends or relatives attended, they went their separate ways until September, when Jeffrey moved from the barracks into Stephanie's apartment, occupying the bedroom vacated by her former roommate. Jeffrey and Stephanie each paid one-half of the rent and their respective long-distance telephone charges; Stephanie paid the utility bills. They had no joint bank accounts. They opened a joint credit card account, but each paid his or her own charges. They did not have a sexual relationship. Jeffrey dated another woman, and Stephanie dated other men, including Paul Comino.

When Paul met Jeffrey, he had no knowledge of the marriage, probably because Stephanie introduced Jeffrey as her roommate. In April 1988, Stephanie and Paul were sexually involved and, at about that time, Stephanie became pregnant. In June, she told Paul about the pregnancy and said he was

---

[1]Evidence Code section 621 was repealed effective January 1, 1994, during the pendency of this appeal. It has been replaced by Family Code sections 7540 and 7541, without substantive change. For the sake of clarity and convenience, we will refer to the Evidence Code.

[2]Civil Code section 7004 has been repealed and replaced by Family Code sections 7611 and 7612, without substantive change. All further statutory references are to the Civil Code unless otherwise stated.

[3]The summary of facts is derived in part from the court's statement of decision. Except as noted, the relevant facts are uncontradicted.

the father.[4] In July, Jeffrey moved out of the apartment he and Stephanie had shared for 11 months.

A few weeks before the birth of the child, Stephanie moved into Paul's home, and they attended at least one Lamaze childbirth class together. On Christmas Eve, Paul was with her when she delivered the baby; he cut the umbilical cord. With his knowledge and consent, the child was named Joshua Paul Comino. Paul was identified as the father on the birth certificate, which was signed by Stephanie.[5]

Stephanie and Paul took Joshua to the home they shared and treated him as Paul's natural son. Stephanie sent out birth announcements to Paul's family and friends, identifying Paul as the father. She sent photographs identifying Joshua as a member of the Comino family.[6] For the next two-and-a-half years, except for one or two brief interludes of separation, Paul, Stephanie and Joshua lived together as a family unit. Paul supported Joshua and shared care-giving responsibilities with Stephanie. When Stephanie returned to work, and until Joshua began attending preschool, Paul's mother provided day care. According to a court-appointed mental health care expert, Joshua and Paul became "well bonded."

Nonetheless, in April 1991, Stephanie moved out of the family residence and into Jeffrey's home.[7] Without identifying any other man as Joshua's father, she told Paul, for the first time, that he might not be the biological father. When she threatened to restrict his access to the child, Paul filed the underlying action against Stephanie and Jeffrey to establish his parental relationship. He also sought and was granted pendente lite custody orders awarding him joint legal and physical custody of Joshua, and 50 percent physical custodial time with the minor.

In his answer to the complaint, Jeffrey denied he was the child's biological or adoptive father, but Stephanie's answer asserted his paternity as a

---

[4]Stephanie denied telling Paul she believed he was the child's father. She said Paul initially advised her to have an abortion or give the child to Paul's mother to raise, but later told her he wanted to help. She said Paul offered to help, not because he thought the baby was his, but simply because "he was a nice person."

[5]Stephanie did not deny she named Paul as the father on the birth certificate. However, she denied she had agreed to give the child Paul's name. She said she was medicated when she signed the document and did not know about the name until three weeks later, when a copy was mailed to her. She took no steps at that time to change Joshua's name because she thought the mistake could be cleared up at some unspecified future time.

[6]On a photograph of Joshua and Paul's grandmother, Stephanie wrote, "Great-Grandma." On another photograph, taken of Joshua and Paul's father, she wrote, "The Proud Grandpa with Joshua, Three Weeks."

[7]Jeffrey had filed for dissolution of the marriage. According to Stephanie, he and she were going to attempt a "reconciliation." In any event, a judgment of dissolution was ultimately entered on February 21, 1992.

matter of law, based on their marriage and cohabitation. Stephanie denied her sexual relations with Paul had resulted in Joshua's conception. Her motion for an order compelling Paul to submit to paternity blood tests was denied. After a two-day trial of the matter, the court adjudged Paul to be the father of Joshua, ordered him to pay child support to Stephanie, and continued joint legal and physical custody.

On appeal, Stephanie contends the court erred in failing to apply the conclusive presumption of Evidence Code former section 621 to establish Jeffrey's paternity as a matter of law. She further contends the doctrine of equitable estoppel cannot be invoked to bar her from contesting Paul's paternity because he failed to carry his burden of establishing a biological link with Joshua.

## DISCUSSION

### I

Evidence Code former section 621, subdivision (a) sets forth a conclusive presumption regarding paternity. It states: "Except as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."[8] However, as another panel of this court recently observed, in *County of Orange* v. *Leslie B.* (1993) 14 Cal.App.4th 976, 980 [17 Cal.Rptr.2d 797], ". . . courts have refused to apply [the conclusive presumption of section 621] when its underlying policies are not furthered. [Citations.]"

In *Leslie B.*, the Orange County District Attorney filed a complaint against two men to establish paternity and provide support for a minor. The first man, Gregory, was married to and lived with the minor's mother, Catherine, when the child, Jennifer, was conceived, but they later separated and divorced. Blood tests conclusively showed he was not the biological father. The second man, Leslie, was having sexual relations with Catherine at the relevant time period. Blood tests established the virtual certainty of Leslie's paternity, and Catherine had told Jennifer he was her father. The trial court concluded Leslie was Jennifer's biological and legal father, and Leslie appealed, contending, as does Stephanie, that the court had an absolute obligation to apply the conclusive presumption of Evidence Code former section 621.

Rejecting the contention, this court first noted Leslie was attempting to use the conclusive presumption to protect himself from responsibility rather

---

[8]Under Evidence Code former section 621, subdivision (b), if all experts conclude the evidence obtained from statutorily authorized blood tests show the husband is not the father, the court shall resolve the question of the husband's paternity accordingly.

than achieve involvement in the life of the child he had fathered. (*County of Orange* v. *Leslie B.*, *supra*, 14 Cal.App.4th 976, 980.) It then discussed the balancing test of *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017] and its progeny, a test under which competing state and private interests are weighed to determine whether the presumption should be applied in a given case. (*County of Orange* v. *Leslie B.*, *supra*, 14 Cal.App.4th 976, 981.) It found the traditional policies underlying the presumption—"to preserve the integrity of the family unit, protect children from the legal and social stigma of illegitimacy, and promote individual rather than state responsibility for child support" (*id.* at p. 980)—would not be served by application of the presumption under the circumstances.[9] "If Leslie prevailed Jennifer would be 'given' a father [Gregory] whom she knows is not her natural father, to preserve the integrity of a family unit that never existed. Catherine, Gregory and Jennifer have never lived together as a family, they share no ties other than those that exist due to a long-ago failed marriage of brief duration. . . . [T]o apply the presumption will not remove 'the stigma of illegitimacy' from Jennifer. She knows Gregory is not her father. She has never been held out as his daughter. She believes Leslie is her father and blood tests have confirmed it. Finally, the state's interest in establishing a source of child support is completely served by declaring Leslie to be the legal father." (*Id.* at p. 983, fn. omitted.)

The *Leslie B.* court also noted how well served Jennifer's interests would be by avoidance of the conclusive presumption regarding Gregory's paternity. "To name Leslie as her legal father entitles her to benefits she is currently unable to receive. She will be entitled to financial assistance from him and will finally have a legal as well as a biological father. While Leslie may suffer some financial hardship as a result of his being declared Jennifer's legal father, this is far outweighed by the benefits to her." (*County of Orange* v. *Leslie B.*, *supra*, 14 Cal.App.4th 976, 983.)

We find *Leslie B.*'s analysis and conclusion abundantly apt here, where none of the policies underlying the presumption of paternity would be served by its application. (1) There is neither a marital union nor a family unit to preserve: The so-called marriage was one in name only and Joshua never lived in a family unit with Stephanie and Jeffrey. (2) To the extent there is a recognizable societal concern for Joshua to have a father, that concern is served by *avoiding* the presumption that would prevent Joshua from enjoying a parental relationship with the only man he has ever known as a father.

---

[9]In a footnote, the *Leslie B.* court acknowledged that with the enactment "of the Uniform Parentage Act and its abolition of any incidents of illegitimacy, the 'stigma' of illegitimacy should not be considered in determining the constitutionality of applying the presumption. [Citation.]" (*County of Orange* v. *Leslie B.*, *supra*, 14 Cal.App.4th 976, 980, fn. 4.)

And (3), the state's interest in making sure Joshua has a source of child support is furthered by the court's order rejecting the presumption and awarding to Paul the responsibility he seeks to assume.

In *Leslie B.*, the reviewing court cited as "apt" the observation of the "learned trial judge" who stated: " '[A]pplying the [presumption] leads to an absurd result that defies reason and common sense. To apply the [presumption] is to rely upon a fiction to establish a legal fact which we know to be untrue, in order to protect policies which in this case do not exist.' " (*County of Orange* v. *Leslie B.*, *supra*, 14 Cal.App.4th 976, 983.) We heartily agree. Here, the court properly refused to apply the paternity presumption of Evidence Code former section 621.

## II

In its statement of decision, the trial court determined Paul was Joshua's presumed father under former section 7004, subdivision (a)(4), which provides for such paternity when a man "receives the child into his home and openly holds out the child as his natural child." There was uncontradicted evidence Paul received Joshua into his home, lived with him, held him out as his own and supported him for nearly two and a half years. In the absence of rebuttal evidence, Paul was unquestionably entitled to the benefit of the statutory presumption.

■ Stephanie initially contends it was Paul's burden to present evidence of biological paternity to take advantage of the presumed father status of section 7004. This contention is ridiculous. By its very terms, the statute creates the *presumption* of natural fatherhood, arising out of a man's acceptance of a child into his home and acknowledgement of it as his own. Paul had no burden to present evidence establishing his biological link with the child. Rather, it was Stephanie's burden to rebut the presumption of natural fatherhood with clear and convincing evidence. (Former § 7004, subd. (c).) ■ She claims blood tests eliminated the probability of Paul's paternity.[10] But she failed to introduce any blood test results into evidence; thus she may

---

[10]Stephanie relies on *In re Olivia H.* (1987) 196 Cal.App.3d 325 [241 Cal.Rptr. 792] to show a man may not achieve presumed father status where evidence establishes he has no biological link to the child. The case, arising out of juvenile dependency proceedings, is distinguishable in several particulars, most notably because the court did not deal with any issue of estoppel—the issue which, as discussed *post*, is dispositive here.

*In Olivia H.*, the court declined to grant presumed father status under former section 7004 to a man who had never lived with the minor's mother, had no biological relationship with the child and had a history of assaultive behavior involving knives and drug abuse requiring repeated hospitalizations for overdoses. In rejecting the man's presumed parent claim, the

not raise the issue on appeal. (*Bach* v. *County of Butte* (1989) 215 Cal.App.3d 294, 306 [263 Cal.Rptr. 565]: "It is elementary that an appellate court is confined in its review to the proceedings which took place in the trial court.")[11]

The judgment is affirmed. Comino shall recover his costs on appeal.

Sills, P. J., and Wallin, J., concurred.

A petition for a rehearing was denied June 21, 1994, and appellant's petition for review by the Supreme Court was denied September 7, 1994.

---

court stated, inter alia: "In this instance, the juvenile court ordered blood tests taken on the issue of paternity, received and evaluated the laboratory reports and found that there was conclusive evidence that defendant was not Olivia's biological father. . . . Under such circumstances, defendant was precluded from establishing presumptive parenthood under Civil Code section 7004." (*In re Olivia H.*, *supra*, 196 Cal.App.3d 325, 330.) Reaching this conclusion, the court relied on former section 7004, subdivision (b), (now Fam. Code, § 7612, subd. (c)), providing the presumption of section 7004, subdivision (a)(4) "is rebutted by a court decree establishing paternity of the child by another man." (196 Cal.App.3d at p. 330.) We note there was no court decree establishing the paternity of the minor by another man; there was simply a blood test showing the man seeking presumed father status was not the biological father. We question whether a negative blood test of one man is the equivalent of an affirmative judicial declaration of paternity of another man, but we need not decide the issue here.

[11]We note there is abundant evidence in the record to support the court's further finding that Stephanie was estopped from rebutting Paul's presumed paternity status. (Evid. Code, § 623.) However, we need not reach the merits of Stephanie's legal argument on the estoppel issue since our conclusions regarding application of Evidence Code former section 621 and Paul's status as a presumed father are dispositive.