[No. B182219. Second Dist., Div. Eight. Oct. 18, 2005.]

LISA I., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PHILLIP V., Real Party in Interest.

**COUNSEL**

Guy C. Iversen for Petitioner.

No appearance for Respondent.

Glen H. Schwartz and Larry M. Hoffman for Real Party in Interest.

**OPINION**

**RUBIN, J.—**

## INTRODUCTION

We are called upon to consider whether a claimed biological father of a child born within 300 days of the mother's divorce from another man has standing under Family Code section 7630 to declare his paternity of that

child.[1] The child was conceived while the mother was married but separated from her husband, was born after the mother's divorce, and is being raised by the mother and ex-husband, along with their two other children. The claimed biological father contends that applying the statutory paternity presumptions and standing requirements to deprive him of the opportunity to establish his paternity would violate a liberty interest protected by the United States Constitution.

We conclude that California's statutory presumptions and standing rules do not violate the biological father's constitutional rights where the biological father has no existing relationship with the child. Accordingly, we grant the mother's writ petition and direct the trial court to grant her motion to quash the paternity action.

## PROCEDURAL AND FACTUAL BACKGROUND

Lisa I., the petitioner here, and Guy were married in October 1993; by 1997, they had two sons. In 2003, while she was separated from Guy, Lisa became pregnant with Dane. Dane was born in May 2004, almost six months after Lisa's divorce from Guy. Dane was given Guy's surname. In November 2004, real party in interest Phillip, who has never been married to Lisa, filed a petition against her to declare his paternity of Dane. Phillip asked for rulings on child support, visitation, joint custody, attorneys' fees, and that Dane's last name be changed to Phillip's surname.

In his supporting declaration, Phillip stated the following: (1) He met Lisa in September 2001, they developed a romantic relationship, and she became pregnant in August 2003; (2) he and Lisa talked about becoming a blended family, but their relationship disintegrated; (3) Lisa did not advise him when she gave birth in May 2004; (4) he learned of the birth by calling the hospital, and did not have an opportunity to sign a declaration of paternity; (5) a month after Dane's birth, he gave Lisa a letter stating he wanted a relationship with the child and would pay for Dane's insurance and support.

Lisa moved to quash the paternity petition, contending only a statutorily presumed father has standing to bring an action to declare his paternity and that Phillip did not qualify as a presumed father. Lisa argued her ex-husband Guy was the only presumed father because Dane was conceived during her marriage to Guy and born within 300 days of her divorce from Guy—the period specified by the Family Code.

---

[1] We assume, for the purpose of this opinion only, that real party in interest Phillip V. is the biological father even though there has been no finding on the subject. All further statutory references are to the Family Code.

In support of the motion, Lisa provided her declaration and that of two other persons. Lisa's declaration stated the following: (1) Dane was conceived while she and her husband Guy were still married; (2) she and Guy have two other young sons; (3) she and Guy were divorced on October 30, 2003; (4) her relationship with Phillip started during her separation from Guy, it ended in June 2003, and she and Phillip were apart during the summer of 2003; (5) Phillip never volunteered to provide any type of emotional or financial support during her pregnancy or after Dane was born; (6) except for a couple of short visits at her mother's home in May and June 2004, Phillip made no efforts to visit Dane or inquire about him; (7) Phillip actively ignored her when they encountered each other on several occasions during the pregnancy, and he ignored Lisa and Dane during encounters after Dane's birth; (8) Phillip never executed or asked her to execute a declaration establishing paternity; (9) she and her children, including Dane, are supported by Guy and her father; (10) she and her children, including Dane, regularly visit and stay with Guy at his home, and together they function as a family—regularly attending parties, sporting events, social gatherings, and other events, as well as planning holidays and vacations; (11) Guy has brought Dane into his home and regularly takes care of him; and (12) Dane's last name is Guy's family name, which is listed in a variety of school, medical, and financial records.

The declarations filed by Lisa's friends stated they have consistently seen Guy care for and support Lisa and Dane, and have seen Dane's baby things in every room of Guy's house, which one of the friends referred to as "Guy and Lisa's house."

The trial court denied Lisa's motion to quash. The court found denying Phillip standing to establish paternity would violate his constitutional right to due process. The court also granted Phillip's request that Lisa and Dane undergo genetic testing.

Lisa filed a petition for writ of mandate challenging the denial of her motion to quash and asked for a stay of all proceedings, including the order requiring genetic testing. We stayed the proceedings and the testing, and issued an order to show cause.

## DISCUSSION

The threshold issue in this case is whether the Family Code grants Phillip, the claimed biological father, standing to pursue his paternity action against Lisa. If not, then we must decide whether applying the statutory paternity presumptions and standing requirements would violate a liberty interest protected by the federal Constitution's due process clause.

1. *Phillip Has No Standing Under Section 7630.*

■ Section 7630, part of the Uniform Parentage Act, lists those persons who have standing to file an action to determine paternity. Subdivision (a) provides, in relevant part, "A child, the child's natural mother, or a man presumed to be the child's father under subdivision (a), (b), or (c) of Section 7611, may bring an action . . . [a]t any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611." Subdivision (b) provides, "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision (d) or (f) of Section 7611." Thus, the essential inquiry in determining a man's standing under section 7630 is whether he is a "presumed father" under the applicable subdivision of section 7611.

■ Section 7611 lists the conditions under which a man will be considered the presumed father of a child. Only subdivisions (a) and (d) are potentially relevant here. Under subdivision (a), a man is presumed to be the natural father of a child if "[h]e and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court." Under subdivision (d), a man is presumed to be the natural father if "[h]e receives the child into his home and openly holds out the child as his natural child."[2]

---

[2] Section 7611 provides: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540) or Chapter 3 (commencing with Section 7570) of Part 2 or in any of the following subdivisions:

"(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.

"(b) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce.

"(2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation.

"(c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) With his consent, he is named as the child's father on the child's birth certificate.

"(2) He is obligated to support the child under a written voluntary promise or by court order.

"(d) He receives the child into his home and openly holds out the child as his natural child.

"(e) If the child was born and resides in a nation with which the United States engages in an Orderly Departure Program or successor program, he acknowledges that he is the child's father

■ "The presumptions arising under section 7611 are rebuttable presumptions affecting the burden of proof and may be rebutted in an appropriate action by clear and convincing evidence. [Citation.] The [Uniform Parentage] Act, however, restricts standing to challenge the presumption of a husband's paternity to the child, the child's natural mother, or a presumed father. [Citations.]" [Fn. 5 omitted.] Footnote 5 reads in part as follows: "[S]ection 7630, subdivision (a), grants standing only to the child, the child's mother, or a man presumed to be the child's father as a result of his marriage to the child's mother to bring an action to declare the existence or nonexistence of the father and child relationship presumed as a result of the mother's marriage to the presumed father . . . . [¶] Section 7630, subdivision (b), by contrast, allows '[a]ny interested party' to bring an action to determine the existence or nonexistence of the father and child relationship presumed under subdivision (d) of section 7611 . . . ." (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937–938 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*), italics omitted.)

■ The paternity presumptions are generated by society's interest in preserving the integrity of the family and legitimate concerns for the welfare of the child. The state has an " ' "interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability." ' " (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65 [120 Cal.Rptr.2d 146, 46 P.3d 932], quoting *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116–1117 [39 Cal.Rptr.2d 535]; see also *Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435, 1442 [37 Cal.Rptr.2d 120] ["applying the statutory presumption furthers the state's interest in preserving the familial relationship between the child and the presumed father"].) These relationships are not always founded in biological reality.

It is clear in this case that Phillip has no standing under the foregoing statutes because he does not qualify as a presumed father. Indeed, Phillip does not attempt to argue he is a presumed father. He was never married to Lisa, he never received Dane into his home, and he never held Dane out to the world as his natural child. In contrast, it is Guy who qualifies as the presumed father under subdivisions (a) and (d) of section 7611 because Guy was married to Lisa when Dane was conceived, Dane was born within 300 days of their divorce, and Guy has received Dane into his home and has held

in a declaration under penalty of perjury, as specified in Section 2015.5 of the Code of Civil Procedure. This subdivision shall remain in effect only until January 1, 1997, and on that date shall become inoperative.

"(f) The child is in utero after the death of the decedent and the conditions set forth in Section 249.5 of the Probate Code are satisfied."

him out to the world as his natural son. Accordingly, because Phillip is not a presumed father, his claimed biological link is insufficient to give him statutory standing to establish his paternity.

2. *Phillip Has No Protected Liberty Interest that Overcomes the Family Code Standing and Presumption Statutes.*

Acknowledging he does not qualify as a presumed father under section 7611, and therefore has no standing under section 7630, Phillip argues his right to establish his paternity is a liberty interest protected by the due process clause of our federal Constitution. Specifically, Phillip contends sections 7611 and 7630 are invalid as applied to him because Dane was conceived while Lisa was separated from Guy, was born after their divorce, and is not being raised in a "subsisting marital family." We conclude that these facts, although largely undisputed, are insufficient to invalidate the substantive paternity laws and the purposes they serve.

█ The overarching consideration in deciding if due process precludes the application of paternity laws in a given situation is whether "an *existing* father-child relationship" between the unwed biological father and the child will be affected. (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1200, 1207–1216 [92 Cal.Rptr.2d 294] (*Brian C.*).)

The leading California exposition of the rule is found in *Dawn D., supra,* 17 Cal.4th 932. As the similarities and differences between the present controversy and *Dawn D.* are important, we review the familial relationships in *Dawn D.* in some detail. In January 1995, Dawn separated from her husband Frank and began living with Jerry. According to Jerry, Dawn told him she would marry him as soon as she legally could and that she wanted to start a family. Jerry began building an addition to his home in anticipation of having a child, and submitted to fertility testing at Dawn's request. After she became pregnant, Dawn told people the baby was Jerry's and that she intended to marry him. (*Id.* at p. 949 (dis. opn. of Chin, J.).) In April, however, Dawn moved back with her husband. That August, Jerry filed an action to establish his paternity to the yet-to-be born child after unsuccessfully attempting to negotiate a child support and visitation agreement with Dawn and Frank. Jerry also completed a parenting course. In November, Dawn gave birth to a son, who lived with Dawn and Frank. (*Id.* at p. 936.)

Dawn moved for judgment on pleadings, contending that Jerry had no standing to establish paternity under section 7630. The trial court denied the motion, finding that, because Jerry had done all he could to demonstrate a commitment to his parental responsibilities, he had established "due process

rights" that must be balanced against the state's interest in enforcing Frank's statutory presumption. (*Dawn D.*, *supra*, 17 Cal.4th at p. 936.) After the court of appeal denied a writ of mandate, our Supreme Court reversed and ordered that judgment be entered in Dawn's favor.

The Supreme Court held that "a biological father's mere desire to establish a personal relationship with the child is not a fundamental liberty interest protected by the due process clause." (*Dawn D.*, *supra*, 17 Cal.4th at p. 942.) Focusing on whether there was an existing relationship between Jerry and the child, rather than simply a desire to *form* a relationship, the court held Jerry did not have a constitutionally protected interest in creating a relationship with the child where none existed, and that application of sections 7611 and 7630 did not deprive him of due process. Jerry's claim failed because "Jerry has never had any personal relationship with Dawn's child, only an alleged biological link with an attempt to negotiate an agreement for child support and visitation." (17 Cal.4th at p. 942.) In other words, because Jerry had not actually received the child into his home or developed a personal relationship beyond their biological connection, Jerry had no constitutional liberty interest in establishing his paternity. Jerry's intent and Dawn's promises were essentially irrelevant.

Our Supreme Court relied significantly on the United States Supreme Court's decision in *Michael H. v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333] (*Michael H.*). *Michael H.* involved a series of events, including a more developed relationship between the biological father and the child than existed in either *Dawn D.* or is present here. There, Carole began an affair with Michael while married and living with Gerald. The child was born into the marriage, but Carole and Gerald separated five months later. Carole and Michael confirmed the child was theirs by blood tests and then lived together for two months, during which time Michael held the child out as his own. Carole then left Michael and began living with another man. Some months later, Michael filed an action to establish paternity and rights to visitation. For eight months while the action was pending, Carole and Michael lived together and Michael held the child out as his own. Carole and Michael even executed a stipulation stating Michael was the natural father. Before the stipulation was filed, however, Carole reconciled with Gerald and continued to live together with him, the child, and two other children born during the marriage. (*Id.* at pp. 113–115.)

A plurality of the United States Supreme Court concluded Michael did not have a liberty interest in continuing his relationship with the child, notwithstanding that he had lived with Carole and the child for a period of time and held the child out as his own. (*Michael H.*, *supra*, 491 U.S. at

pp. 124–127.) Manifestly, those four justices "necessarily rejected as well the position that a biological connection without any actual personal relationship gives rise to a protected liberty interest." (*Dawn D.*, *supra*, 17 Cal.4th at p. 941.) Although three dissenting justices concluded the actual personal relationship between the biological father and the child was a protected liberty interest, those three acknowledged a biological connection alone was not sufficient. Thus, seven of the nine justices agreed that an unwed father's biological link to a child alone did not give rise to a constitutionally protected liberty interest: "[A]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so." (*Michael H.*, at pp. 142–143, fn. 2 (dis. opn. of Brennan, J., joined by Marshall & Blackmun, JJ.); see also *Dawn D.*, *supra*, 17 Cal.4th at p. 942.)

It was the concurrence of views in the *Michael H.* opinions on this issue that caused our Supreme Court in *Dawn D.* to conclude that the question of whether a biological father without an existing personal relationship with a child has a protected liberty interest "has a ready answer," citing *Michael H.* (*Dawn D.*, *supra*, 17 Cal.4th at p. 941.) And the answer was that a father in that situation had no such liberty interest. (*Ibid.*) We now apply these principles to the case before us.

■ Here, Phillip's only link to Dane is his contention that he is the biological father. Phillip has no relationship with Dane. And, other than his letter offering to provide Dane with insurance and support (which Lisa denies receiving) and two short visits with him between May and June 2004, Phillip made no substantial efforts to establish a parent-child relationship with Dane or provide for his or Lisa's support. Contrary to Phillip's assertion that he nonetheless has a constitutional liberty interest in the *opportunity* to develop a relationship with Dane, this was precisely the test proposed by the dissent in *Dawn D.* and specifically rejected by the majority of that court. *(Dawn D., supra*, 17 Cal.4th at p. 942; see *id.* at p. 948 (dis. opn. of Chin, J.).)

Phillip cites several cases for the proposition that a biological father has a constitutional right to establish paternity where the mother's marriage to the presumed father terminated shortly after the child was born. He contends under the circumstances of this case, where Dane was born after Lisa and Guy's divorce, that the paternity presumptions do not further the state's interest in the sanctity of marriage. He points out that in neither *Dawn. D.* nor *Michael H.* did the mother and presumed father divorce. Careful analysis of Phillip's authorities reveals they are not helpful.

The first of the three is *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123] (*Lisa R.*). There, the juvenile court ruled that under former

parentage statutes, the biological father had no standing to participate in juvenile dependency proceedings. By the time the trial court made its ruling, the marital father and the mother, both of whom had a history of substance abuse, had died. The child was in foster care. The biological father and mother had lived together both before and after Lisa was born. The biological father was named in the birth certificate and had contributed to support. Only when the mother had returned to live with the marital father and had taken Lisa with her was the biological father deprived of custody. When he eventually learned of ongoing juvenile dependency proceedings, the biological father appeared at a scheduled hearing and sought to introduce evidence of his paternity. The juvenile court refused.

The Supreme Court held that a presumption which prevented the claimed biological father from offering evidence to prove paternity was unreasonable and a denial of due process under the circumstances. As *Lisa R.* precedes both *Dawn D.* and *Michael H.* by more than a decade, the Supreme Court's opinion does not contain the now familiar concepts of "substantive due process" and "protected liberty interest." (E.g., *Dawn D., supra,* 17 Cal.4th at p. 941.) Nevertheless, its discussion of due process and "private interests" (*Lisa R., supra,* 13 Cal.3d at p. 648) appears doctrinally consistent with the court's later analysis in *Dawn D.* The *Lisa R.* court concluded there were substantial private interests that arose "from more than the mere biological fact that he is Lisa's natural father." (*Id.* at p. 649.) The court cited the "more than casual" relationship between the biological father and the mother, the fact the two adults had lived together for four or five months, the former had contributed to support, and the mother had used the biological father's name. (*Ibid.*) In contrast, the court found the state's interest in denying standing to be minimal: although the state had a legitimate interest in promoting marriage and not impugning the family unit, that interest had been "dissolved" by the death of both the mother and the marital father. (*Id.* at p. 650.)

*Lisa R.* is essentially consistent with *Dawn D.*'s holding that a protected liberty interest does not arise from biological connection alone but from the existing relationship, if any, between the biological father and child. It was present in *Lisa R.* but not in *Dawn D.,* and it is not present here. Assuming *Lisa R.*'s reference to the countervailing state interest in marriage still has vitality after *Dawn D.* and is applicable beyond dependency proceedings, it is not dispositive here. It is true that the family here is not fully intact; however, the state interest in the stability of the existing relationship among Guy, the mother and all three children is far more pronounced than the death-dissolved former family unit in *Lisa R.*[3]

---

[3] The majority opinion in *Dawn D.* cites *Lisa R.* only for a procedural matter and not for the point that a biological father who has no existing relationship with the child nevertheless has a protected liberty interest which must be balanced with any state interest in preserving the

Phillip also cites *In re Melissa G.* (1989) 213 Cal.App.3d 1082 [261 Cal.Rptr. 894] (*Melissa G.*), another dependency proceeding. Melissa was born in August 1983, eight days prior to the marital parents' separation. Four months later the mother and Melissa began living with Melissa's biological father. The mother and biological father were married in August 1984 and had another daughter. Melissa continued to live with her mother and biological father for the next three years. When the mother was occasionally in jail because of alcohol abuse, the biological father alone cared for Melissa. In July 1987, the biological father was arrested for spousal abuse, and a dependency petition was filed against him and the mother. Over the objection of the Department of Social Services, Melissa, and the biological father, the juvenile court agreed with mother's prior husband that he was Melissa's conclusively presumed father because she was born prior to his separation from the mother. (*Id.* at p. 1084.)

The Court of Appeal reversed. The opinion discusses both the nonexistent original family unit consisting of the presumed father and mother, and the existing family relationship of the biological father and Melissa. A fair reading of the decision reveals that the court struggled with how much weight to give to the fact that the original marriage no longer was intact. It noted that in the then-recently decided *Michael H.*, the United States Supreme Court was faced with a paternity claim by a biological father that would have interfered with a husband and wife who wanted "to raise [the wife's] child jointly." (*Michael H., supra,* 491 U.S. at p. 129, fn. 7.) The *Michael H.* plurality said that a protected liberty interest might exist when no such union exists. The Court of Appeal observed, however, that the original family unit was intact when Melissa was born even though it was no longer so. Ultimately the *Melissa G.* court found that the biological father, who had an existing relationship with Melissa, had a protected liberty interest. (*Melissa G., supra,* 213 Cal.App.3d at pp. 1088–1089.)

In the present case, Guy and Lisa, previously married, wish to raise their son jointly. This is not the fully intact family present in *Michael H.* and *Dawn D.* where the parents first separated but then reconciled without getting a divorce. On the other hand, it is not the situation in *Lisa R.* where both parents were dead or in *Melissa G.* where the divorced mother and presumed father had no relationship at all. *Dawn D.* does not discuss *Melissa G.* so we cannot discern whether the Supreme Court would have found more significant the fact that in this case Guy and Lisa are together and raising three sons, or that they are no longer married and do not have an existing formal marital union to preserve. However, *Dawn D.*'s holding is clear that where the

relationship between the mother and presumed father. (See *Dawn D., supra,* 17 Cal.4th at p. 939.) The dissent, on the other hand, relies extensively on *Lisa R.* to explain that the court should have adopted a balancing test. (See, e.g., *Dawn D.* at p. 962 (dis. opn. of Chin, J.).)

biological father has no relationship with the child, there is no protected liberty interest. It was absent in *Dawn D.*, is absent here, and present in *Melissa G.* In light of *Dawn D.*, we find the precedential value of *Melissa G.* doubtful at best.

The third case on which Phillip relies, *Brian C., supra*, 77 Cal.App.4th 1198, is likewise unavailing. There, Ginger married William in March 1994. She met Brian in December 1994. Ginger and Brian commenced a relationship that month. In late January 1995, the two of them had sex in a Las Vegas hotel room, and it was about that time that Ginger's daughter, Kennedy, was conceived. During this same period of time, Ginger lived, and had a sexual relationship, with her husband. In March, Ginger left her husband and moved into an apartment which she rented with Brian. Kennedy was born in October 1995. Brian was present at Kennedy's birth, his name appeared as Kennedy's father on her birth certificate and baptismal records, and the three of them lived together. (*Id.* at pp. 1201–1202.)

One year later, Ginger and Brian broke up. However, Brian continued to see Kennedy after work each day and had custody on weekends until May 1997, when Ginger unilaterally "cut off all contact" because she and her husband William were reconciling. Brian continued to try to see Kennedy, calling Ginger and leaving messages all to no avail. Brian filed a paternity action, and Ginger moved for summary judgment. The trial court concluded that because Ginger and William were cohabitating at the time Kennedy was conceived, the conclusive presumption of section 7540 applied. (*Brian C., supra*, 77 Cal.App.4th at p. 1202.) That section provides that "the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."

The appellate court disagreed and concluded that the important factor in overriding statutory presumptions of paternity was the existence of a relationship between the unwed father and the child. The court, relying extensively on *Dawn D.*, stated, "Ginger, Brian and Kennedy were the only 'family' known by Kennedy for the first year of her life"; and the court held Brian had "a strong private interest in continuing an *existing* parent-child relationship based on a substantial period of time elapsing between the child's birth and the mother's return to her husband." (*Brian C., supra*, 77 Cal.App.4th at pp. 1217–1218, original italics.) Although Phillip here trumpets the result in *Brian C.*, he fails to acknowledge that, unlike the biological father there, he has had no existing relationship with Dane.

█ As these cases exemplify, an existing relationship between the unwed father and the child is paramount in whether to nullify paternity presumptions. Substantive rules of paternity law will not be automatically

applied in situations where their effect would be to terminate an existing father-child relationship. However, when there is no existing relationship between the claimed biological father and the child, courts must defer to legislative choices reflected in paternity statutes. (See *Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354, 362–363 [216 Cal.Rptr. 748, 703 P.2d 88] [claimed biological father's abstract interest in establishing paternity not as weighty as the state's interest in familial stability and the welfare of the child]; *Caban v. Mohammed* (1979) 441 U.S. 380, 397 [60 L.Ed.2d 297, 99 S.Ct. 1760] [parental obligations and rights "do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."]; *Comino v. Kelley* (1994) 25 Cal.App.4th 678, 684 [30 Cal.Rptr.2d 728] [court refused to apply conclusive presumption to deny the child the only father she had ever known]; *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 239 [71 Cal.Rptr.2d 399] ["There is . . . an obvious distinction between a biological father who has actually established a parent and child relationship, and a man who has not established such a relationship but would like to do so. Only the former are presumed fathers under section 7611, subdivision (d)"].)

 The fact the mother and a presumed father chose to terminate their marriage by divorce is not, by itself, a sufficient reason to conclude the state no longer has a legitimate interest in applying the paternity presumptions and preserving ongoing familial relationships. (See *Susan H. v. Jack S., supra,* 30 Cal.App.4th at pp. 1442–1443 [application of paternity presumption furthers substantial state interests in preserving the familial relationship between the child and presumed father and in promoting the child's welfare even after the marriage between the presumed father and the mother has been dissolved].) Indeed, by its very terms, section 7611, subdivision (a)'s presumption is specifically intended to apply in the situation where the marriage dissolves and the child is born within 300 days of the dissolution.

Guy also cites *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 823 [4 Cal.Rptr.2d 615, 823 P.2d 1216], an adoption case, and *Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272 [7 Cal.Rptr.2d 460] (*Michael M.*), in support of his position. Yet, our Supreme Court, in *Dawn D.,* while acknowledging both of these cases, considered and rejected the claimed biological father's constitutional arguments. (*Dawn D., supra,* 17 Cal.4th at p. 936.) As stated in *Dawn D.*'s concurring opinion, adoption cases such as *Adoption of Kelsey S.* are not applicable because those cases concern the situation where the unwed mother voluntarily surrenders her parental responsibilities by giving up her child to third parties, thereby not only dissolving any family unit but ending all parental relationship whatsoever. (*Dawn D.,* at p. 943; see also *id.* at pp. 946–947 (conc. opn. of Kennard, J.).) In such cases, the recognition of the biological father's "opportunity interest" in developing a

relationship with his child, preserved by demonstrating a full commitment to parental responsibilities, does not necessarily conflict with the state's interest in family integrity and preserving ongoing family relationships. (See *Michelle W. v. Ronald W.*, *supra*, 39 Cal.3d at pp. 361–362.) Adoption cases also involve different statutory schemes, including notice requirements, than is present here. (See *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 [43 Cal.Rptr.2d 445, 898 P.2d 891].)

In *Michael M.*, unwed parents conceived a child while living together. The mother then left the biological father, married another man, and the child was born during that marriage. (*Michael M.*, supra, 5 Cal.App.4th at p. 1277.) Principally relying upon *Adoption of Kelsey S.*, the appellate court allowed the biological father to establish his paternity because the court believed he had promptly and sufficiently attempted to form a relationship with the child, and thus he had preserved his "opportunity interest." (*Id.* at pp. 1284–1285.) We doubt that the broad reference to "opportunity interest" in *Michael M.* has any meaningful precedential value after *Dawn D.* The case is cited only twice in the *Dawn D.* opinion. The first time, the Supreme Court noted that the trial court had relied on *Michael M.* in making its order, an order the Supreme Court vacated. The second time, the court stated that family interests are not threatened if a man marries an unwed women who is then pregnant with another man's baby. No such facts exist here, as Guy and Lisa were married when Dane was conceived. (See also *Fuss v. Superior Court* (1991) 228 Cal.App.3d 556 [279 Cal.Rptr. 46] [biological father's rights not cut off by mother who conceived child while unmarried and then married another man before birth].)[4]

## CONCLUSION

That this area of law is still in its evolutionary stage is obvious. The United States Supreme Court's effort to grapple with the subject in *Michael H.*, produced a plurality opinion of four justices, two concurring opinions and two dissenting opinions. *Dawn D.* generated three opinions. The uncertainty likely will continue in the near future because the so-called nuclear family, on which many of our paternity laws are based, now resembles more of an electron field.

---

[4] Likewise inapposite are those cases (e.g., *County of Orange v. Leslie B.* (1993) 14 Cal.App.4th 976 [17 Cal.Rptr.2d 797]) where courts have ignored statutory presumptions to prevent a biological father from avoiding child support obligations by disassociating himself from the child. Both the majority and the dissent in *Dawn D.* agreed that those cases are distinguishable. (See *Dawn D.*, *supra*, 17 Cal.4th at p. 943; *id.* at p. 962 (dis. opn. of Chin, J).)

▮ The clearest pronouncement from our Supreme Court is that biological fathers who have developed an existing relationship with a child have a protected liberty interest (*Dawn D.*). The interest claimed by Phillip here, the so-called "opportunity interest," is significantly limited, if it exists at all, to those situations where the marital parents are either dead (*Lisa. R.*) or have relinquished an interest in the child by placing the child for adoption by third persons (*Kelsey S.*). To the extent these exceptions to *Dawn D.*'s mandate of an existing relationship have any current viability, they are simply not applicable to the case before us. Here, Lisa has always had custody of Dane. Guy, the presumed father, is the only father Dane has ever known. Lisa and Guy have consistently assumed the parental role both in and outside their marriage. Although arguably *Dawn D.* presented a stronger case for denying a biological father a protected liberty interest because there the mother and presumed father never divorced, we see little practical difference in the facts of this case, and none at all from the vantage point of the mother and the child. The uncertainty in their lives that would be created if Phillip were afforded standing is no less than that which would have occurred in *Dawn D.*

▮ Of course, the Legislature is free to change the presumed father and standing laws if it chooses. Until it does, courts are left with the difficult job of grafting elusive substantive due process concepts onto a statutory scheme. Our Supreme Court has cautioned that courts must be careful in this endeavor, emphasizing that, even though we have a duty to entertain such challenges, we must always presume the constitutional validity of legislative acts and resolve doubts in favor of the statute. (*Dawn D., supra,* 17 Cal.4th at p. 939.) Given that tether, we find no compelling reason to invalidate the application of the Family Code under the circumstances.[5]

---

[5] The wariness with which both our Supreme Court and the United States Supreme Court have entered this field appears related to the vagaries inherent in applying substantive due process to a complex statutory scheme. As our highest court said in another context, " 'guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' " (*Washington v. Glucksberg* (1997) 521 U.S. 702, 719 [138 L.Ed.2d 772, 117 S.Ct. 2258, 117 S.Ct. 2302].) Because of this uncertainty, Justice Kennard in her concurring opinion in *Dawn D.* sounded a warning to biological fathers, a warning which, with slight modification, has application here: "A man who wishes to father a child and ensure his relationship with that child can do so by finding a partner, entering into a marriage, and undertaking the responsibilities marriage imposes. One who instead fathers a child with a woman married to another man takes the risk that the child will be raised within that marriage and that he will be excluded from participation in the child's life. The due process clause of the United States Constitution provides no insurance against that risk and is not an instrument for disrupting the marital family in order to satisfy the biological father's unilateral desire, however strong, to turn his genetic connection into a personal relationship." (*Dawn D., supra,* 17 Cal.4th at p. 947 (conc. opn. of Kennard, J.).)

## DISPOSITION

The petition is granted. The trial court is ordered to (1) vacate its order of March 22, 2005, denying Lisa's motion to quash Phillip's paternity action and granting genetic testing, and instead (2) issue a new order granting the motions to quash and for testing, and dismissing Phillip's action.

Petitioner shall recover her costs.

Cooper, P. J., and Boland, J., concurred.

On November 8, 2005, the opinion was modified to read as printed above.